# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

## BENSON LUMBER CO. v. McCANN.

(Circuit Court of Appeals, Ninth Circuit. May 3, 1915.)

### No. 2410.

1. MASTER AND SERVANT ⬤═288, 289—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Defendant's sawmill was equipped with a push table, upon which the lumber, after leaving the trimmer, was delivered sidewise by means of an inclined slide composed of parallel skids. In the top of the table were transverse rollers to carry the lumber lengthwise and deliver it upon a carrier or loading table outside the mill and two feet lower. The roller at the end next the carrier table was a dog roller, equipped with spikes to engage the lumber and keep it moving. The machinery was designed to automatically and continuously move the lumber from the saw to the carrier table; but the slide was defective, in that the skids were too far apart, permitting some of the pieces to drop between endwise, where they would stick and cause a jam. Then it was necessary for some one to climb upon the push table, which was nearly six feet high, and relieve the jam. No one was designated to perform such service, but it was usually done by one of the employés loading lumber from the carrier table. Plaintiff, a boy 17 years old, was one of such workmen, and when he had been at work about two weeks, in attempting to step from the carrier table to the push table to relieve such a jam, his foot was caught and crushed by the dog roller. He had not been instructed in respect to such work, nor warned of the danger. It did not appear that there was any safer way of mounting the push table than the one he took. *Held*, that he could not be said as matter of law to have assumed the risk from such danger, which was not a normal and ordinary risk of his employment, and that such question and the question of contributory negligence were for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1090, 1092–1132; Dec. Dig. ⬤═288, 289.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

2. MASTER AND SERVANT ⬤═230—MASTER'S LIABILITY FOR INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

The ordinary care which an employé is required to exercise to protect himself from injury is not the same quantum of care in case of an inexperienced youth as in case of a mature and experienced man.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 687–700; Dec. Dig. ⬤═230.]

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Olin Wellborn, Judge.

Action at law by H. C. McCann, by Jesse F. McCann, his guardian ad litem, against the Benson Lumber Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Gibson, Dunn & Crutcher and Norman S. Sterry, all of Los Angeles, Cal., and Wright & Winnek and Leroy Wright, all of San Diego, Cal., for plaintiff in error.

Hunsaker & Britt, of Los Angeles, Cal., and Haines & Haines, of San Diego, Cal., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. [1] This action was originally brought in the state court of California on July 30, 1908, to recover damages for personal injuries sustained by the defendant in error on July 30, 1907, while employed in the sawmill of the plaintiff in error in San Diego county, Cal. The parties will hereafter be referred to as plaintiff and defendant, as they were designated in the court below. The case was removed to the Circuit Court of the United States for the Southern District of California on the ground of diverse citizenship. The case was tried upon a second amended complaint, an amended answer, and an amendment to the answer. It was alleged in the second amended complaint that the defendant's mill was so constructed and operated that logs in continuous succession were delivered upon a carrier and carried by it backwards and forwards until cut into lumber by the great band saw of the mill; that such lumber was then delivered by connected machinery of the mill in continuous succession to a sawing table inside of the mill, known as a trimmer, and there cut into lengths; that from said trimmer the lumber was carried by connected machinery and discharged in continuous succession sidewise down a chute or slide made of parallel skids to a platform outside of the mill, known as a push table; that the defendant maintained, and by connected machinery caused to operate and revolve in the surface of the push table, rollers, including a roller studded with "dogs," projections, or spikes, for the purpose of carrying the lumber lengthwise at right angles from the direction at which it came upon the push table, until it dropped from the push table downwards about two feet to a loading table, known as the carrying table, where it was loaded as fast as received by the employés of the defendant upon wagons or trucks and carried away; that the whole process of converting logs into lumber was a continuous one; that, in order that such process should be continuous and uninterrupted, it was necessary to prevent any accumulation, collecting, or jamming of lumber, either upon the slide, push table, or carrying tables; that on the 30th day of July, 1907, the plaintiff was of the age of 17 years 3 months, or thereabouts, and was employed by the defendant upon and about said chute or slide and said platform or push table and the loading or carrying table; that the plaintiff was required as a part of his work to keep the lumber moving in a continuous stream down such chute or slide and along the push table, and to see that the lumber did not collect, jam, or pile up

on said chute or slide, or on the push table; that whenever the lumber did collect, pile up, or jam on the chute or slide, or on the push table, the plaintiff was required to go upon the push table and loosen and disentangle the lumber and the jam, while the rollers upon the surface of the push table were operating and revolving, and while the lumber was being delivered thereon in a continuous stream; that at the time the plaintiff was injured the defendant had provided no other means for mounting upon such push table than to step up and upon the same from the carrying table, over the dog roller revolving at the end of the push table next to the carrying table. This method of keeping the lumber moving in a continuous stream and relieving it from jams and other similar obstructions is charged to have been defective and unsafe in various particulars, among others, that the defendant did not provide the inclined plane of the chute or slide with a sufficient number of skids or other devices to carry the lumber from the mill to the push table, and it is charged that the defendant failed to use ordinary, or any, care to provide a safe way or safe appliances for the use of the plaintiff in doing the work in which he was employed. It is alleged that the plaintiff, by reason of his youth and inexperience, did not know of the perils and dangers to which he was exposed by the defendant, and that the defendant neglected to warn him of the perils and dangers incident to his employment. It is alleged that on the 30th day of July, 1907, while the plaintiff was so employed, a large amount of lumber became clogged and jammed between the skids and the push table, and that the plaintiff, while he was mounting and going upon the push table to disentangle the lumber, as he was required to do by the defendant, was caught by the "dog" roller revolving in the surface of the push table, and thrown down on the push table, and his right foot was torn, bruised, wounded, and mangled, by reason of which injury the plaintiff was required to and did have his foot amputated. Damages for such injury are alleged in the sum of $25,000, and liability for necessary board, lodging, and surgical and medical aid and treatment, amounting to $485, making a total of $25,485, for which judgment was demanded.

The amended answer to the second amended complaint denied substantially all of the allegations of the complaint. It was admitted that one or two pieces of lumber did become clogged between the skids, but it was denied that the plaintiff was required to go upon the push table, or upon any table whatever, either while the roller was in operation or revolving, or otherwise, or at all. It was admitted that the defendant had provided no means for mounting the push table, and alleged that such table was not to be mounted by any of the defendant's servants, agents, or employés at any time while said mill was in operation. It was alleged that the push table was not a place to be mounted, or for the doing of any work thereon, and that the dog roller was not an appliance over or about which the plaintiff, or any other person whomsoever, was required or permitted to do any work whatsoever. It was further alleged that the plaintiff was fully informed and instructed as to said work, and the danger, if any, that might pertain thereto. It was also alleged that the defendant

had instructed the plaintiff not to go on or upon the push table, and had not only warned and instructed him not to go on said push table, but had ordered him not to go on said push table. In a further separate and distinct answer it is alleged that the injuries sustained by the plaintiff were directly and proximately contributed to and caused by the fault, carelessness, and negligence of the plaintiff, and by his failure to exercise ordinary care for his own protection; and for a further separate and distinct answer it is alleged that the injuries which the plaintiff sustained were incident to the business in which he was employed, and that prior to receiving such injuries the plaintiff knew, or by the exercise of ordinary care on his part should have known, of the dangers incident to working in the position in which he was, and that the plaintiff assumed the risk of being injured as he was in and about said work, and that the injuries he received were risks assumed by him as incident to his employment. This answer was verified by the vice president and manager of the defendant, and filed on the 24th day of July, 1909. When the case was reached for trial in September, 1913, an amendment to defendant's amended answer, verified by its manager, was filed, in which certain of the denials in the amended answer that the plaintiff was required by the defendant to go upon the push table were stricken out, including the allegation that the defendant had provided no means for mounting the push table, and in lieu of these denials and the admission mentioned it was denied:

"That it [the defendant] had not provided any means for mounting upon said push table, and alleges that there were other, better, and safer means and methods for mounting said push table than at the place and in the manner in which said plaintiff, at the time the injuries alleged to have been received by him, attempted to mount said push table from the carrying table and over said dog roller; and defendant further alleges that lumber buggies were kept constantly alongside said push table, and that it was the custom of the employés, whenever it became necessary to mount said push table, to mount the same from said lumber buggies, which was a safe, easy, and convenient means of mounting said push table."

The case was tried before the court and a jury and resulted in a verdict for the plaintiff in the sum of $8,000. The case comes here upon questions of law arising out of the instructions given and refused to be given by the court to the jury concerning the duty which the defendant as an employer owed to the plaintiff as an employé and the rule respecting plaintiff's assumption of risk and contributory negligence. The verdict of the jury was in effect a finding that the defendant was guilty of negligence in discharging its duty to the plaintiff. The defendant raises no question here upon that issue, but it is too important a feature of the case to pass without examination for the purpose of determining the character of the risk which the defendant contends the plaintiff assumed in the work in which he was employed at the time of the accident.

The allegations of the complaint concerning the construction and operation of the defendant's mill were fully supported by the evidence. It appears, further, that it was the design and purpose of the carrier mechanism of the mill to move the lumber automatically from the great band saw to the carrier table outside of the mill without hitch or jam. But it failed at times at at least one point, namely, at the slide or

chute, where sticks would occasionally drop down endwise between the skid timbers, leaving the end of the stick above the slide or chute, where it would stop the further descent of the lumber and cause a jam. To relieve this jam some one would go onto the push table to pull out the fallen stick, which would allow the timber to descend to the push table and be carried thence automatically to the carrier or loading table. It was in going upon the push table to relieve such a jam, caused by a stick falling between the skid timbers, that the plaintiff was injured.

In the defendant's answer to the plaintiff's second amended complaint, the theory of the defense appears to have been that the carrier mechanism operated automatically in accordance with its design and purpose, and hence it was alleged that the push table was not to be mounted by any of the servants, agents, or employés of the defendant at any time while the mill was in operation. It was further alleged that the push table was not a place to be mounted for the doing of any work thereon, and that the defendant had instructed and warned the plaintiff not to go upon such table. In the amendment to the defendant's amended answer, filed when the case was called for trial, certain of the denials in the original answer, denying that the plaintiff was required to go upon the push table to loosen or disentangle any lumber which might become clogged or piled up on the slide or chute, and the allegation that the push table was not to be mounted by any of the defendant's servants, agents, or employés, were stricken out, and in lieu thereof it was alleged that there were other, better, and safer means and methods for mounting the table than at the place and in the manner in which the plaintiff attempted to mount the push table at the time he was injured; that lumber buggies were kept constantly along the side of the push table, and that it was the custom of the employés, when it became necessary to mount the push table, to mount the same from the lumber buggies, which was a safe, easy, and convenient means of mounting the push table.

The allegations of the complaint charging the defendant with negligence in maintaining a defective carrier mechanism were thus practically admitted, and the defense was shifted to the allegations in the amendment to the answer that the lumber buggies afforded a better and safer means and method for mounting the push table than the place and manner of mounting the table adopted by the plaintiff. This was a question of fact upon which evidence was submitted to the jury. It appears therefrom that the surface of the push table was 5 feet 7 inches above the level of the loading platform on which the plaintiff stood; that the length of this table was 17 feet 11 inches and its width 4 feet. It had in its surface across the width of the table 5 iron rollers about 6 inches in diameter revolving in the direction of its length towards the carrying table. One of the rollers was at the end of the push table opposite the carrying table. Two rollers were intermediate between this end roller and the roller at the end of the table next to the carrier table. The latter roller was studded with iron spikes or "dogs" from three-eighths to three-quarters of an inch in length. The purpose of the spikes was to engage the sticks of lumber on their under side and carry them forward onto the carrying table. These

rollers rose an inch above the surface of the push table and revolved at the rate of from 100 to 150 revolutions per minute, being geared to a revolving shaft of the same velocity. This shaft was 2 inches in diameter and extended along the edge of the push table for its whole length within 6 inches of the top of the table. The upper surface of the shaft was for more than one-half of its diameter exposed and uncovered, and was itself a menace to the safety of any one mounting to the push table from a lumber buggy or cart. The carrier table was located 2 feet distant from the push table and 2 feet lower in elevation. In the space between the end of the push table and the loading table there was a small platform at a height of 2 feet and 4 inches from the floor of the loading platform, with a small step leading to it from the loading platform for the purpose of facilitating the workman in mounting to the push table. From this small platform to the carrying table was 1 foot 3 inches. From the carrying table to the push table the distance was 2 feet horizontally and 2 feet perpendicularly, or 2 feet 9 inches in a direct line from the top of the carrying table to the top of the push table. This was an easy way to reach the top of the push table, but it involved stepping over the dog roller at the end of the push table heretofore mentioned. The other way to reach the push table was from the top of a two-wheel lumber push cart, if one happened to be on the loading platform in front of the push table at the moment when required. These carts had a platform over the wheels between 2 feet and 2 feet 6 inches in height above the floor of the loading platform. To mount upon the push table from a lumber cart standing by the push table involved a climb of more than 3 feet over the revolving shaft running along under the edge of the push table, if the cart was empty. If the cart was loaded, the top of the load might reach to near the top of the push table, or if partly loaded then only to a corresponding height; but a loaded or partly loaded cart was not always there, and its presence, and the height of the load, might not correspond with the emergency requiring an immediate climb to the push table. In any climb from a lumber cart to the push table there was danger from the revolving shaft. These were the two ways of reaching the push table, when, on the day of the accident, a stick dropped between the skid timbers, and, standing upon end, a jam of lumber immediately followed. To pull out this stick and release the jam the plaintiff undertook to reach the push table by way of the carrying table, but in attempting to step over the dog roller at the end of the push table his foot was caught and carried down between the dog roller and a board fixed across the front of it, and crushed so that the foot had to be amputated.

The board in front of the dog roller constituted a combination with the dog roller that was the immediate and efficient cause of the injury to the plaintiff's foot. This board was designated in the model of this part of the mill introduced in evidence and brought to this court with the return to the writ of error as "X." The board in question will therefore be designated as the "X" board. It was a board or plank nailed on the end of the push table, parallel with the dog roller for its entire length, and far enough away from the spikes in the roller to allow them to clear the board from 1 to 3 inches. The defendant's

outside foreman in charge of this work was T. C. Kilty. He was called as a witness for the defendant, and on cross-examination he testified that "the plank 'X' had no connection with the pushing of the lumber. It had no utility whatever in handling the lumber." This fact is obvious from an inspection of the model and an examination of the testimony. The plaintiff testified:

"I do not know what this board which was immediately in front of the spike roller was for. I was informed afterwards that it was there for the purpose of avoiding getting your clothes in the teeth of that roller when you got up on the platform, but I never knew it at the time."

The plaintiff at the time of the accident was of the age of 17 years 3 months. He had been employed in the mill about 2 weeks before the accident, and was one of four men who took the lumber as it came from the mill onto the carrying table and loaded it on trucks to be carried away. The plaintiff was not warned as to the dangers incident to his work, or instructed how he should go onto the push table to clear away a jam at that point. The foreman, Kilty, testified with respect to the plaintiff's employment as follows:

"When I employed this boy, I did not take him and point out the possible dangers of this machinery. I showed him his place, and started him—instructed him what to do, the same as all the rest of the men. I never said anything about the jams at all to any of those men about that push table. They knew their job was to release those jams, if there was any. Every man around the place knows their job. The boy knew that, too. I did not instruct him at all as to how he ought to go upon the push table. I just told him where his place was to work; that is what I told him. I didn't tell him that I expected him to work at releasing these jams when it occurred. I didn't happen to tell him that duty. I didn't tell that to any man there. They knew it was part of their job. They were there to take all of the timber that came from the mill. They were to take it off the platform, and it was their duty to see it came on the platform. They knew that. I didn't have to tell them that particular thing that way. They knew, if it was necessary to do so in their judgment, they must get upon the push table. They knew their job, and they knew they had to take all the lumber that came from the mill. I didn't tell them how to get up on the push table at all. I never had to give them that particular instruction. I didn't speak about the push table at all. I gave them no instructions about the push table. I would think I was insulting a man to tell him to watch out for this revolving shaft if they got up over it. You didn't have to tell them that."

It is contended by the defendant that the plaintiff was injured as the result of the risk which he assumed, and he therefore cannot recover, and the trial court erred in denying the defendant's motion for a directed verdict in its favor. In Choctaw, Oklahoma & Gulf Ry. Co. v. McDade, 191 U. S. 64, 68, 24 Sup. Ct. 24, 48 L. Ed. 96, Schlemmer v. Buffalo, Rochester & Pittsburgh Ry. Co., 220 U. S. 590, 596, 31 Sup. Ct. 561, 55 L. Ed. 596, Texas & Pac. Ry. Co. v. Harvey, 228 U. S. 319, 321, 33 Sup. Ct. 518, 57 L. Ed. 852, Gila Valley Co. v. Hall, 232 U. S. 94, 102, 34 Sup. Ct. 229, 58 L. Ed. 521, and in the recent case of Seaboard Air Line Railway v. Horton, 233 U. S. 492, 503, 504, 34 Sup. Ct. 635, 58 L. Ed. 1062, the Supreme Court has referred to certain distinctions that have been developed in the law of master and servant with respect to the assumption of risk by the employé, and has defined a contractual assumption of risk as employment necessarily fraught with danger to the workman; that is to say, employment where the

workman must be and is confronted with danger in the line of his duty. With respect to dangers of this character the workman assumes the risk, because "such dangers as are normally and necessarily incident to the occupation are presumably taken into account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not." This definition of an assumed risk is plainly not applicable to this case. The plaintiff was not a workman of mature years; but we pass that for the present to consider whether the risk and danger the plaintiff encountered were normally and necessarily incident to the occupation in which he was engaged. The dropping of a stick of timber between the skid timbers, causing a jam of lumber at that point, was wholly extraneous and collateral to the normal purpose of the carrier machinery. It was not intended to operate in that way, and it was not necessary that it should, and the fact that it did operate in that way was evidence of its defective and negligent construction and operation by the defendant, causing a risk which the plaintiff presumably did not assume. In other words, the failure of the carrier machinery to deliver automatically onto the push or carrier table all of the lumber that came to it was not a normal functioning of the machinery employed in that service. It was abnormal, and the evidence tends to show that the defendant knew it and failed to remedy the fault. This was negligence, and because of this negligence the plaintiff was required to mount the push table to relieve the jam. The plaintiff testified that he did not mount the push table by way of the lumber cart, because the latter was either too high or too low. If he remembered rightly, the cart was piled up exceptionally high with pieces that would have fallen off if he had tried to get up that way. This testimony was not contradicted.

This brings us to the consideration of the "X" board in front of the dog roller, over which the plaintiff had to go to reach the lumber jam from the push table. This board performed no service and had no utility or function in the work of the mill, and after the accident it was knocked out by an employé because it served no useful purpose and was dangerous. It created a danger that was not normally incident to the plaintiff's employment. With respect to such a risk the Supreme Court in the case of Seaboard Air Line v. Horton, supra, said:

"But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employé is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them."

Whether the plaintiff was aware of the danger of the dog roller in connection with the "X" board, and of the risk arising from it, were, of course, questions for the jury, upon which testimony was introduced; but it appears that before the trial the defendant had taken the plaintiff's deposition wherein he testified:

"I have not been in the mill since this accident. I have testified about the way the machinery was operated. Those were all things that I knew myself.

I knew myself in a general way how the mill was run, and knew how the machinery was operated. I never had any experience before this. When I went to work there, I studied the machinery, and went to the man in charge of it whenever I didn't understand something about it, so that I understood the general operation of the mill."

Upon the trial he testified:

"I knew that the roller was revolving; as near as I can remember the roller made about 100 revolutions a minute."

With respect to the danger of getting his foot into the roller he said:

"I know it now. I didn't stop to think about it then. I suppose I knew it. Most likely I knew, if I got my foot in there, it would be injured. I don't see how you can expect me to state that I knew, if I got my foot in there, it would be badly injured, at least would be injured, when I never gave it a thought at the time. I suppose I ought to know, if that is what you mean. I knew the board 'X' in the model was there. I never attempted to put my foot on that board by stepping on the carrying table, on the board, and then over. * * * I never stopped to think whether it was dangerous to step up there or not. I never had any occasion, I guess, to have me stop and think. I never gave any thought to whether there was any danger to get up on the carrying table or push table. * * * If I had had occasion to stop and think, I would have known and appreciated that there was danger."

We are asked upon this testimony to hold as a conclusion of law that the plaintiff was aware of the danger and risk of the dog roller in combination with the "X" board. But the plaintiff was not a workman of mature years, and he had had but little experience in the employment in which he was engaged, and he had not been warned of the danger incident to the work. His statements with respect to the danger of his employment:

"I did not stop to think about it then. * * * I never gave it a thought at the time. * * * If I had had occasion to stop and think, I would have known and appreciated that there was danger"

—instead of being admissions that he had assumed the risk of going onto the push table in the manner he did, was rather a frank statement of a youth that he did not appreciate the danger of the situation. He was at the age when physical activity usually outruns judgment and experience, unless restrained and directed by others possessed of greater experience and greater judgment. This restraint and direction he did not have. It therefore becomes a question whether he appreciated the danger and risk to which he was exposed. This was not a question of law, but a question of fact for the jury. Whether the danger and risk of the employment were so obvious that an ordinarily prudent person of his age would under the circumstances have observed and appreciated them was for the same reason a question of fact for the jury.

[2] But it is contended that, if the plaintiff did not assume the risk of his employment, his testimony shows that he was guilty of contributory negligence. We do not think this conclusion follows as a matter of law. In the case of Petersen v. California Cotton Mills Company, 20 Cal. App. 751, 130 Pac. 169, the plaintiff, who was 17 years of age, fell from a ladder which he had mounted to place a compound upon a moving belt. The ladder was so placed that it was

almost perpendicular to the floor of the mill, and, upon being mounted, slipped, throwing the plaintiff upon the revolving machinery, and he was injured. He brought suit against the mill company to recover damages. The defense was that the plaintiff had been guilty of contributory negligence in mounting the ladder. Upon the trial the plaintiff in his testimony showed familiarity with the construction and operation of the mill and its dangers, and admitted that he knew how the latter ought to be placed, and that if it was placed right it would not slip. The appellate court, in commenting on this testimony, said:

"The Socratic method of the examination was admirable, and it revealed an intelligent and candid witness; but the conclusion that his answers required the withdrawal of the question of negligence from the jury is opposed to the principle enunciated in well-considered cases, and is the result of a failure to give due prominence to certain significant features of the occasion. These circumstances, briefly stated, are the complexity of the situation, the fact that plaintiff was a minor, and presumably without the judgment of an adult, that he was ordered by his superior to do the work, which was outside of and more hazardous than his usual employment, that he was expected to and did obey promptly, and that he had a right to assume that the ladder was placed with due regard for his safety."

A petition for rehearing of this case in the appellate court was denied, and a petition thereafter presented to the Supreme Court for rehearing in that court was also denied. The case in all its details is very similar to the present case, including the age of the plaintiff and his frank admissions, drawn out by the questioning of skillful counsel, concerning the dangers incident to his employment; but the court held that the question of contributory negligence was one of fact for the jury, and it could not be said as a matter of law that no other rational inference could be drawn than that the plaintiff was guilty of contributory negligence.

This view of the question of contributory negligence is in accord with the decision of the Supreme Court of the United States in numerous cases. In the late case of Texas & Pacific Ry. Co. v. Harvey, 228 U. S. 319, 324, 33 Sup. Ct. 518 (57 L. Ed. 852) that court said:

"It has often been held in this court that ordinarily negligence or contributory negligence is not a question of law, but of fact, to be settled by the finding of the jury. Where there is uncertainty as to the existence of negligence or contributory negligence, whether such uncertainty arises from a conflict of testimony, or because, the facts being undisputed, fair-minded men might * * * draw different conclusions therefrom, the question is not one of law."

In view of all the facts and circumstances of this case we cannot say that no fair-minded man could come to any other conclusion but that the plaintiff was guilty of contributory negligence. It follows that we are of opinion that the court did not err in denying the defendant's motion for a directed verdict in its favor.

The court in its instructions left with the jury the question of the assumption of risk by the plaintiff with respect to his working in an unsafe place and with unsafe machinery, as alleged in the complaint, with the specific instruction that the plaintiff could not recover if he knew them to be unsafe and fully understood, comprehended, and appreciated the dangers incident to their use. To this and other instruc-

tions upon the same subject the defendant objected in substance because the court did not instruct the jury further that the plaintiff could not recover if, in the absence of actual knowledge, he would have fully understood, comprehended, and appreciated the dangers incident thereto, *had he exercised ordinary care and caution.*

In an appropriate place the court instructed the jury that contributory negligence was such an act or omission on the part of the person injured amounting to want of ordinary care, as, concurring or co-operating with any negligent act or omission on the part of the defendant, was a proximate cause of the injury. Ordinary care, the court stated, was such care as would be used by an ordinarily prudent person in the same or similar circumstances. To this instruction there was no objection on the part of the defendant. The court further instructed the jury that the ordinary care which a youth of limited judgment and experience is called upon to exercise is not the same quantum of care which the adult would be called upon to use under the same circumstances; that each is required to use ordinary care, but the care which the person of mature intelligence and judgment must employ is different from the amount which the law exacts of a youth of immature age, judgment, and experience. To this instruction the defendant objected on the ground that the law does not exact a different amount of care from an adult than from a youth; that each is required to exercise ordinary care, and is required to guard himself from open and obvious dangers which he knows, comprehends, appreciates, and fully understands, *or should by the exercise of ordinary care upon his part have fully appreciated, known, comprehended, and understood.* We are of the opinion that the instruction of the court was correct as applied to the question of contributory negligence, and that neither the instruction to which no exception was taken, nor this one, to which an exception was taken, was applicable to the question of an assumption of risk.

In Choctaw, Oklahoma, etc., Ry. Co. v. McDade, 191 U. S. 64, 67, 24 Sup. Ct. 24, 48 L. Ed. 96, the action was brought by the widow and children of McDade, a brakeman, to recover damages for the death of McDade, caused by the negligence of the railroad company in maintaining an overhanging waterspout in dangerous proximity to passing cars. There was evidence tending to show that McDade was killed as the result of being struck by an overhanging spout. The charge of the trial court had exonerated the railroad company from fault if in the exercise of ordinary care McDade might have discovered the danger. The Supreme Court held that this charge upon the assumption of risk was more favorable to the defendant than the law required; that the true test was not the exercise of ordinary care to discover dangers, but whether the danger was known or plainly discoverable by the employé—citing the case of Texas & Pacific Ry. Co. v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188. In distinguishing this rule from the rule respecting contributory negligence the court said:

"The question of assumption of risk is quite apart from that of contributory negligence. The servant has the right to assume that the master has used due diligence to provide suitable appliances in the operation of his

business, and he does not assume the risk of the employer's negligence in performing such duties. The employé is not obliged to pass judgment upon the employer's methods of transacting his business, but may assume that reasonable care will be used in furnishing the appliances necessary for its operation."

Section 1970 of the Civil Code of California, as amended by the act of the Legislature of March 6, 1907 (Statutes of 1907, p. 119), provides that an employer is not bound to indemnify his employé for losses suffered by the latter in consequence of the ordinary risks of the business in which he was employed, and after some further limitation upon the liability of the employer for injuries caused by the negligence of a fellow servant, it provides that:

"Knowledge by an employé injured of the defective or unsafe character or condition of any machinery, ways, appliances or structures of such employer shall not be a bar to recovery for any injury or death caused thereby, unless it shall also appear that such employé fully understood, comprehended and appreciated the dangers incident to the use of such defective machinery, ways, appliances, or structures, and thereafter consented to use the same, or continued in the use thereof."

No provision is here made that the employé shall not recover if he fails to exercise ordinary care to understand, comprehend, and appreciate the dangers incident to his employment; but it is contended by the defendant that this statute did not change or modify the rule of the common law, and that a servant was entitled to recover for an injury caused by any defect in the ways, machinery, or structures with which or about which he was required to work, unless he appreciated the danger incident thereto, *or by the exercise of ordinary care on his part he would have appreciated it.* We shall not prolong this opinion by discussing that question, or the cases cited in support of the defendant's contention. We may concede that the defendant is right with respect to the question of contributory negligence. But we are dealing with the rule relating to the assumption of risk, as distinguished from the rule relating to contributory negligence. It is with respect to the latter that the employé is held to the exercise of ordinary care to protect himself from injury if he is to recover for such injury, and for the employer this is a separate and distinct defense to an action on the part of the employé for the injury; and, as we have seen, the court correctly instructed the jury upon this feature of the case.

The right of the plaintiff to recover in this case is based upon facts which the evidence tended to prove—that the defendant was negligent with respect to the construction and operation of the mill in which the plaintiff was employed; that such negligent construction and operation were the proximate and efficient cause of the plaintiff's injury; that the plaintiff was of immature years, with but little experience in his employment; that he had not been warned of the dangers incident to the work in which he was engaged, and such dangers were not the normal and ordinary risks and dangers of the employment, but were abnormal and extraneous to the useful and proper operation of the mill. As the case was thus presented to the court, we are of opin-

ion that all of the instructions of the court correctly stated the law to the jury.

Finding no error in the record, the judgment of the court below is affirmed.