05-5132-cv, 05-2593-cv
ATSI Commc'ns v. Shaar Fund; ATSI Commc'ns v. Wolfson

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2006

(Argued: November 29, 2006                    Decided: July 11, 2007)

Docket No. 05-5132-cv

-----------------------------------------------------------x

ATSI COMMUNICATIONS, INC., a Delaware Corporation,

                    Plaintiff-Appellant,

        - v. -

THE SHAAR FUND, LTD., SHAAR ADVISORY SERVICES, N.V., RGC
INTERNATIONAL INVESTORS, LDC, ROSE GLEN CAPITAL MANAGEMENT, L.P.,
CORPORATE CAPITAL MANAGEMENT, INTERCARIBBEAN SERVICES LTD., CITCO
FUND SVCS., LUC HOLLMAN, SAM LEVINSON, HUGO VAN NEUTEGEM, DECLAN
QUILLIGAN, WAYNE BLOCH, GARY KAMINSKY, STEVE KATZNELSON, TRIMARK
SECURITIES, INC., LEVINSON CAPITAL MANAGEMENT, and W.J.
LANGEVELD,

                    Defendants-Appellees,

MARSHALL CAPITAL SERVICES, LLC., JESUP & LAMONT STRUCTURED
FINANCE GROUP, MG SECURITY GROUP, INC., CROWN CAPITAL
CORPORATION, JOHN DOES 1-50, KENNETH E. GARDINER, NATHAN LIHON,
and SEI INVESTMENT CO.,

                    Defendants.

-----------------------------------------------------------x

Docket No. 05-2593-cv

-----------------------------------------------------------x

ATSI COMMUNICATIONS, INC., a Nevada Corporation,

                    Plaintiff-Appellant,

        - v. -

URI WOLFSON,

                    Defendant-Appellee,

SAM LEVINSON,

                    Defendant.

---------------------------------------------------------x

B e f o r e :  JACOBS, Chief Judge, WALKER and RAGGI, Circuit Judges.

    Appeals from judgments of the United States District Court for the Southern District of New York (Lewis A. Kaplan, Judge), dismissing plaintiff ATSI Communications, Inc.'s complaints alleging, inter alia, securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 357 F. Supp. 2d 712 (S.D.N.Y. 2005).

    AFFIRMED.

THOMAS I. SHERIDAN III (Andrea Bierstein, Melissa C. Welch, on the brief), Hanly Conroy Bierstein & Sheridan LLP, New York, New York, for ATSI Communications, Inc.

JONATHAN M. SPERLING (Amanda J. Gourdine, on the brief), Covington & Burling, New York, New York, for The Shaar Fund, Ltd., Shaar Advisory Services, N.V., Levinson Capital Management, Sam Levinson, and Uri Wolfson.

J. KEVIN MCCARTHY (Joanne L. Monteavaro, on the brief), Wilmer Cutler Pickering Hale and Door LLP, New York, New York, for Rose Glen Capital Management, L.P., RGC International Investors, LDC, Wayne Bloch, Gary Kaminsky, and Steven Katznelson.

DAVID G. CABRALES (W. Scott Hastings, Jeffrey A. Logan, on the brief), Locke Liddell & Sapp LLP, Dallas, Texas; Cahill Gordon & Reindel LLP (Thorn Rosenthal, Janet A. Beer, on the brief), New York, New York, for Trimark Securities, Inc.

MICHAEL J. DELL (Elaine Golin, on the brief), Kramer Levin Naftalis & Frankel LLP, New York, New York, for Citco Fund Services (Curaçao) N.V., InterCaribbean Services, Ltd., Hugo van Neutegem, Wim Langeveld, Luc Hollman, and Declan Quilligan.

Berkman, Henoch, Peterson & Peddy, P.C. (Ronald M. Terenzi, on the brief), Garden City, New York, for Corporate Capital Management.

JOHN M. WALKER, JR., Circuit Judge:

These appeals arise from judgments of the United States District Court for the Southern District of New York (Lewis A. Kaplan, Judge), dismissing plaintiff ATSI Communications, Inc.'s ("ATSI") complaints under Fed. R. Civ. P. 12(b)(6) in two separate actions arising from the same events. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 357 F. Supp. 2d 712 (S.D.N.Y. 2005). ATSI alleges that the defendants made misrepresentations in

-3-

connection with securities transactions and engaged in market manipulation in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, or were liable as control persons under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). ATSI claims that the defendants fraudulently induced it to sell to them its convertible preferred stock. The defendants then aggressively short sold ATSI's common stock and converted the preferred stock to cover their short positions. The alleged consequence was a "death spiral" in the price of ATSI's stock and enormous profit for the defendants.

We affirm the judgments of the district court.

**BACKGROUND**

The following facts are taken from ATSI's complaints and supporting documents, which we must assume to be true in reviewing a Fed. R. Civ. P. 12(b)(6) dismissal. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

**A.   ATSI and Its Efforts to Raise Money**

ATSI was founded in December 1993 and hoped to become a leading provider of retail communications services in Mexico in the wake of the deregulation and privatization in Latin America's telecommunications markets. It never turned a profit. By 1999, ATSI needed an infusion of capital to expand its U.S. customer base and further develop its telephone network in Mexico.

To raise money, ATSI issued four series of cumulative convertible preferred stock ("Preferred Stock"): Series B, C, D, and E. Each transaction included a Securities Purchase Agreement, a Certificate of Designation, and a Registration Rights Agreement. Each series included a risk-mitigating conversion feature that worked as follows. Upon conversion, a "Market Price" was calculated as the average of the lowest five closing bid prices during the ten-day period preceding the conversion date. The "Conversion Price" was calculated as the lesser of (1) the closing bid price on a trading day fixed by the Certificate of Designation and (2) the Market Price discounted by 17% to 22% depending upon the series. ATSI would then issue a number of shares of common stock equal to (1) the number of shares of Preferred Stock to be converted (2) multiplied by the Preferred Stock's stated value of $1,000 per share (3) divided by the Conversion Price. Because there is no limit on the number of common shares into which the Preferred Stock could convert, securities such as these are called "floorless" convertibles. The obvious inference from ATSI's sale of these securities is that these unfavorable terms were necessary to attract investors because ATSI was continuously losing money. In fact, ATSI acknowledged that in light of its financial condition, it might "not be able to raise money on any acceptable terms." American Telesource International, Inc., Annual Report (Form 10-K), at 16 (July 31, 2000).

**1.    Sales to the Levinson Defendants**

On a "road show" in Dallas, Texas in March 1999, defendant Corporate Capital Management ("CCM") introduced ATSI executives to defendant Sam Levinson, the managing director of Levinson Capital and the Shaar Fund. Shaar Advisory Services, N.V. ("Shaar Advisory") served as executive officer and general partner of the Shaar Fund. Defendant Uri Wolfson controls the Shaar Fund. Collectively, Levinson, Levinson Capital, the Shaar Fund, and Shaar Advisory constitute the "Levinson Defendants."

During a May 1999 telephone conversation, CCM told ATSI that the Shaar Fund had invested in several strong, successful companies and that the Levinson Defendants were interested in ATSI's long-term growth. During a June meeting, Levinson told ATSI, inter alia, that the Levinson Defendants sought a long-term investment in ATSI and would not engage in any activity to depress its stock. ATSI claims that all of these representations were false and misleading because CCM and Levinson knew otherwise and the Levinson Defendants were actually market manipulators that profited at the expense of the companies in which they invested.

Over the next six months, ATSI entered into the following securities transactions with the Shaar Fund.

| Transaction Date | # of Preferred Shares Purchased | # of Warrants Purchased | Total Purchase Price |
|---|---|---|---|

| July 2, 1999 | 2,000 Series B | 50,000 | $2,000,000 |
| Sept. 24, 1999 | 500 Series C | 20,000 | $500,000 |
| Feb. 22, 2000 | 3,000 Series D | 150,000 | $3,000,000 |

The Securities Purchase Agreement for each transaction included written representations that:

1. The Shaar Fund was an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933; and

2. "Neither [the Shaar Fund] nor its affiliates nor any person acting on its or their behalf has the intention of entering, or will enter into, prior to the closing, any put option, short position, or other similar instrument or position with respect to the Common Stock [of ATSI] and neither [the Shaar Fund] nor any of its affiliates nor any person acting on its or their behalf will use at any time shares of Common Stock acquired pursuant to this Agreement to settle any put option, short position or other similar instrument or position that may have been entered into prior to the execution of this Agreement."

ATSI claims that these representations were false because (1) the Shaar Fund's net worth was not high enough to meet the requirements for being an accredited investor and (2) the Shaar Fund intended to engage, and did engage, in short selling and

manipulation of ATSI's stock before, during, and after entering into these agreements.

The Registration Rights Agreement in each transaction contained a merger clause stating that:

> There are no restrictions, promises, warranties, or undertakings, other than those set forth or referred to herein. This Agreement, the Securities Purchase Agreement, the Escrow Instructions, the Preferred Shares and the Warrants supersede all prior agreements and undertakings among the parties hereto with respect to the subject matter hereof.

The Registration Rights Agreements contemplated that the Shaar Fund would soon sell its converted common stock into the public markets. They required ATSI to use its "best efforts" to register the common stock to be issued upon conversion of the Preferred Stock within 90 days of closing and to take all reasonable steps to help the Shaar Fund sell the common stock. They also imposed, at most, a 90-day holding period before the Shaar Fund could convert its Preferred Stock. The only restriction upon the Shaar Fund's ability to sell the common stock was if ATSI notified it of a material misstatement in the stock's prospectus.

### 2. Sales to Rose Glen

In September 1999, ATSI decided to issue $15 million in its equity to fund an acquisition. Defendant Crown Capital Corporation ("Crown Capital"), acting as placement agent, recommended defendants RGC International Investors, LDC, and Rose Glen Capital Management, L.P. Defendants Wayne Bloch, Gary

Kaminsky, and Steve Katznelson were employees of Rose Glen Capital Management. We refer collectively to all of these defendants as "Rose Glen."

During negotiations, Rose Glen allegedly made false verbal representations similar to those made by the Levinson Defendants.

On September 27, 2000, Rose Glen submitted a draft term sheet to ATSI offering a $10 million investment. ATSI claims that it then fell victim to a bait-and-switch when, on October 16, 2000, Rose Glen submitted closing documents providing for only a $2.5 million investment in Series E Preferred Stock, with a promise of further investment of up to $10 million if certain conditions were met. ATSI says it was forced to accept these terms because it was required to pay $2 million to vendors in Mexico the next day. ATSI sold Rose Glen additional Series E Preferred Stock in March and July of 2001.

The Purchase Agreement pursuant to which these securities were sold included two representations by Rose Glen that ATSI claims to be false on the same basis as the Levinson representations:

1. Rose Glen was an accredited investor; and

2. Rose Glen was purchasing the Preferred Stock and common stock issuable upon conversion:

        for its own account and not with a present view
        towards the public sale or distribution thereof
        except pursuant to sales registered or exempted
        from registration under the 1933 Act; <u>provided,
        however</u> that by making the representation herein,

> the Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or exemption under the 1933 Act.

The Registration Rights Agreements also contained a merger clause similar to the one in the Shaar Fund transaction documents.

### B. The "Death Spiral" Financing Manipulation Scheme

In addition to these misrepresentations, ATSI claims that all of the defendants manipulated the market in ATSI's common stock by bringing about a "death spiral" in the price of ATSI's common stock. The scheme, as alleged, worked as follows. The shareholder would short sell the victim's common stock to drive down its price.[1] He then converts his convertible securities into common stock and uses that common stock to cover his short position. The convertible securities allow a manipulator to increase his profits by allowing him to cover with discounted common shares not obtained on the open market, to rely on the convertible securities as a hedge against the risk of loss, and to dilute existing common shares, resulting in a further decline

---

[1] An investor sells short when he sells a security that he does not own by borrowing the security, typically from a broker. <u>See</u> <u>Levitin v. PaineWebber, Inc.</u>, 159 F.3d 698, 700 (2d Cir. 1998). At a later date, he "covers" his short position by purchasing the security and returning it to the lender. <u>Id.</u> A short seller speculates that the price of the security will drop. <u>Id.</u> If the price drops, the investor profits by covering for less than the short sale price. <u>Id.</u> If, on the other hand, the price increases, the investor takes a loss. A short seller's potential losses are limitless because there is no ceiling on how high the stock price may rise.

in stock price. ATSI was aware of the risk of dilution; for example, it disclosed in the registration statement on its Form S-3 that it expected the Shaar Fund to convert shortly after the registration became effective and that future issuances of Preferred Stock would put downward pressure on and dilute its common stock.

ATSI accuses the Levinson Defendants, Wolfson, and Rose Glen of deliberately causing a "death spiral" in its common stock. The Shaar Fund began converting its Preferred Stock shortly after it was contractually permitted to do so. During the first two quarters of fiscal year 2000, it had converted all of its Series B shares into approximately 2.6 million common shares. Although ATSI's April 14, 2000 Form S-3 states that the Shaar Fund sold the common stock, the complaints do not allege any such sales. Between December 12, 2000 and January 23, 2002, the Shaar Fund converted its Series D shares into 8,331,454 shares of ATSI common stock. Between March 8, 2001 and August 14, 2002, Rose Glen converted its Preferred Stock into over nineteen million shares of common stock.

ATSI does not allege any specific acts of short selling by the Levinson Defendants, but it includes circumstantial allegations. It alleges that searches in the SEC's Edgar database reveal that of the 38 companies that reported the Levinson Defendants as investors, 30 experienced stock price

-11-

declines indicative of a "death spiral" financing scheme. Its allegations against Rose Glen are of like kind.

ATSI also relies on the magnitude and timing of changes in its stock price and trading volume. At the time of the Series B transaction in July 1999, its stock traded at $1.50 per share. Two months later, it traded at $1.08 per share. In February 2000, the Series D Preferred Stock purchase was preceded by a significant increase in the daily trading volume of ATSI's shares and a dramatic rise in ATSI's share price to $9 per share (perhaps not coincidentally as ATSI listed its stock on the American Stock Exchange ("AMEX") during that period). April 2000 saw massive stock sales and large price declines in ATSI's stock. For example, between April 13, 2000 and April 18, 2000 – during which time ATSI filed a registration statement for the common stock into which the Series C and D Preferred Stock would convert – the price fell from $6.50 per share to $3.62 per share on heavy volume. ATSI claims that these price movements could only have resulted from sales by the Levinson Defendants, despite Levinson's claim that the Shaar Fund was not selling.

ATSI's stock price climbed up to $6 per share by early-June 2000. On September 8, 2000, ATSI's registration of common stock for the Series C and D Preferred Stock became effective and, by November 28, 2000, its price had fallen to $0.75 per share, and plummeted to $0.09 per share on August 16, 2002.

In addition to these price fluctuations, ATSI relies more specifically on price movements and trading volume around the time that the Shaar Fund and Rose Glen converted their Series D and E Preferred Stock, which worked to their benefit. ATSI further points to instances where its stock price reacted negatively to positive news. ATSI also points to a 10-trading-day period between December 31, 2002 and January 14, 2003 in which Depository Trust Company records show that over eight million shares were traded in excess of settlement, which it claims could only result from sham trading.

**C.    Other Defendants**

ATSI alleges that any manipulation had to involve defendant Trimark Securities, Inc. ("Trimark"), which served as the principal market maker in ATSI's stock.

ATSI also alleges that several defendants, hereinafter referred to as the "Citco Defendants," caused the Shaar Fund to engage in the charged misconduct. Defendant Citco Fund Services (Curaçao) N.V. is the parent of defendant InterCaribbean Services, Ltd., the Shaar Fund's sole director. Declan Quilligan is a director of InterCaribbean. W.J. Langeveld, Hugo Van Neutegem, and Luc Hollman served as Managing Directors of Shaar Advisory.

**D.    ATSI's Demise**

Telecom stocks were generally hard-hit during the period in which ATSI alleges manipulation. Between February 22, 2000 (the date on which ATSI issued the Series D Preferred Stock) and October 31, 2002 (the date on which ATSI filed its first suit), the AMEX North American Telecom Index (of which ATSI's stock was not a component) dropped by 73%. When ATSI filed its complaint, its stock traded at $0.02 per share. Its financial impairment has rendered it unable to raise capital to maintain or expand its business.

**E.   ATSI's Claims and Procedural History**

ATSI claims that the Levinson Defendants, Wolfson, Langeveld, Rose Glen, CCM, and Crown Capital are liable for misrepresentations under § 10(b) and Rule 10b-5; that these same defendants and Trimark are also liable for market manipulation in violation of Rule 10b-5; and that the Citco Defendants and others not relevant to this appeal are liable as control persons under § 20(a). ATSI also asserts various state law claims.

ATSI filed its complaint in the first suit in October 2002 against all defendants except Wolfson ("ATSI I"). In March 2004, the district court dismissed ATSI's first amended complaint against the Levinson Defendants and Rose Glen for failing to satisfy the pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). It dismissed as to the other defendants for improper service and lack of personal jurisdiction. Second and third

-14-

amended complaints followed and, in July 2004, ATSI filed a largely identical complaint against Levinson and Wolfson in a separate suit ("ATSI II"). In February 2005, the district court dismissed the third amended complaint in ATSI I under Fed. R. Civ. P. 12(b)(6) with prejudice for again failing to satisfy Rule 9(b) and the PSLRA's pleading requirements. See ATSI Commc'ns, 357 F. Supp. 2d at 720. Because subject matter jurisdiction was based solely on ATSI's federal claims, the district court did not separately consider the state law causes of action. The district court entered judgment under Fed. R. Civ. P. 54(b), and the parties in ATSI II stipulated to dismissal based on the district court's order in ATSI I.

ATSI's timely appeals followed.

**DISCUSSION**

**I. Legal Standards**

We review a district court's dismissal of a complaint pursuant to Fed. R. Civ. P. 12(b)(6) de novo, accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). In addition, we may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the

-15-

plaintiff and upon which it relied in bringing the suit. Rothman, 220 F.3d at 88. To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level."[2] Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint. Id. at 1969.

Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss. First, a complaint alleging securities fraud must satisfy Rule 9(b), Ganino, 228 F.3d at 168, which requires that "the circumstances constituting fraud . . . shall be stated with particularity," Fed. R. Civ. P. 9(b). This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits. Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

---

[2] We have declined to read Twombly's flexible "plausibility standard" as relating only to antitrust cases. See Iqbal v. Hasty, - F.3d -, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007). "Some of [Twombly's] language relating generally to Rule 8 pleading standards seems to be so integral to the rationale of the Court's parallel conduct holding as to constitute a necessary part of that holding." Id.

speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. <u>Novak v. Kasaks</u>, 216 F.3d 300, 306 (2d Cir. 2000). Allegations that are conclusory or unsupported by factual assertions are insufficient. <u>See</u> <u>Luce v. Edelstein</u>, 802 F.2d 49, 54 (2d Cir. 1986).

Second, private securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal. <u>See</u> 15 U.S.C. § 78u-4(b)(3)(A). In pleading scienter in an action for money damages requiring proof of a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[3] <u>Id.</u> § 78u-4(b)(2). The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. <u>Ganino</u>, 228 F.3d at 168-69. Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, – S. Ct. –, 2007 WL 1773208, at *10 (June

---

[3] In a Rule 10b-5 action, scienter requires a showing of "intent to deceive, manipulate, or defraud," <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 194 n.12 (1976), or reckless conduct, <u>In re Carter-Wallace, Inc. Sec. Litig.</u>, 220 F.3d 36, 39 (2d Cir. 2000); <u>SEC v. U.S. Envtl., Inc.</u>, 155 F.3d 107, 111 (2d Cir. 1998) (stating in dicta that reckless behavior is sufficient to plead scienter).

-17-

21, 2007).  For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and <u>at least as compelling</u> as any opposing inference one could draw from the facts alleged."  <u>Id.</u> (emphasis added).

If the plaintiff alleges a false statement or omission, the PSLRA also requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

**II.  ATSI's Market Manipulation Claims**

**A.  Market Manipulation and Short Selling**

Section 10(b), in proscribing the use of a "manipulative or deceptive device or contrivance," <u>id.</u> § 78j(b), prohibits not only material misstatements but also manipulative acts.  <u>Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 177 (1994).  Under the statute:

> "Manipulation" is "virtually a term of art when used in connection with securities markets."  The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.  Section 10(b)'s general prohibition of practices deemed by the SEC to be "manipulative" – in this technical sense of artificially affecting market activity in order to mislead investors – is fully consistent with the fundamental purpose of the [Exchange] Act "to substitute a philosophy of full disclosure for the philosophy of caveat emptor . . . ."

*Sante Fe Indus. v. Green*, 430 U.S. 462, 476-77 (1977) (alteration in original) (citations omitted).  Thus, manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."  *Ernst & Ernst*, 425 U.S. at 199.  The critical question then becomes what activity "artificially" affects a security's price in a deceptive manner.

Although not explicitly described as such, case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security.  The deception arises from the fact that investors are misled to believe "that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999); *see also* *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366, 374 (6th Cir. 1981) (stating that the Supreme Court has indicated that manipulation under § 10(b) refers to "means unrelated to the natural forces of supply and demand"); *cf.* *Pagel, Inc. v. SEC*, 803 F.2d 942, 946 (8th Cir. 1986) (agreeing with the SEC that "[w]hen individuals occupying a dominant market position engage in a scheme to distort the price of a security for their own benefit, they violate the securities laws by perpetrating a fraud on all public investors"); *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 796 (2d Cir. 1969)

(holding that nondisclosure of large open market purchases combined with large secret sales to deter stockholders from participating in a competing tender offer violated Rule 10b-5 by "distort[ing] the market picture and deceiv[ing] the [issuer's] stockholders").

In identifying activity that is outside the "natural interplay of supply and demand," courts generally ask whether a transaction sends a false pricing signal to the market. For example, the Seventh Circuit recognizes that one of the fundamental goals of the federal securities laws is "to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded," and thus looks to the charged activity's effect on capital market efficiency.[4] See Sullivan & Long, Inc. v. Scattered Corp., 47 F.3d 857, 861 (7th Cir. 1995). The Seventh Circuit's focus on disruptions to the efficient pricing of a security is consistent with our view that in preventing market rigging, § 10(b) seeks a market where "competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the

---

[4] The efficient capital market hypothesis, as adopted by the Supreme Court, posits that "the market price of shares traded on well-developed markets reflects all publicly available information." See Basic Inc. v. Levinson, 485 U.S. 224, 246 & n.24 (1988).

-20-

market price reflects as nearly as possible a just price." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir. 1996) (quoting H.R. Rep. No. 73-1383, at 11 (1934)).  In an efficient market, trading engineered to stimulate demand can mislead investors into believing that the market has discovered some positive news and seeks to exploit it, see In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 579 (S.D.N.Y. 2005), aff'd Tenney v. Credit Suisse First Boston Corp., No. 05-3450-cv, 2006 WL 1423785 (2d Cir. May 19, 2006); the duped investors then transact accordingly.  To prevent this deleterious effect on the capital markets, the Third Circuit distinguishes manipulative from legal conduct by asking whether the manipulator "inject[ed] inaccurate information into the marketplace or creat[ed] a false impression of supply and demand for the security . . . for the purpose of artificially depressing or inflating the price of the security."  GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 207 (3d Cir. 2001); see also Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615, 627-28 (D.N.J. 2003).

Market manipulation is forbidden regardless of whether there is a fiduciary relationship between the transaction participants. See United States v. Russo, 74 F.3d 1383, 1391-92 (2d Cir. 1996); United States v. Regan, 937 F.2d 823, 829 (2d Cir. 1991).  A market manipulation claim, however, cannot be based solely upon misrepresentations or omissions.  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005).  There must be some market

-21-

activity, such as "wash sales, matched orders, or rigged prices." See Sante Fe, 430 U.S. at 476.

Furthermore, short selling – even in high volumes – is not, by itself, manipulative. GFL, 272 F.3d at 209. Aside from providing market liquidity, short selling enhances pricing efficiency by helping to move the prices of overvalued securities toward their intrinsic values. See id. at 208; Sullivan & Long, 47 F.3d at 861-62 (discussing the defendants' short sales as arbitrage that eliminates disparities between price and value); In re Scattered Corp. Sec. Litig., 844 F. Supp. 416, 420 (N.D. Ill. 1994); John D. Finnerty, Short Selling, Death Spiral Convertibles, and the Profitability of Stock Manipulation 2-3 (Mar. 2005), available at http://www.sec.gov/rules/petitions/4-500/jdfinnerty050505.pdf; Ralph S. Janvey, Short Selling, 20 Sec. Reg. L.J. 270, 272 (1992). In essence, taking a short position is no different than taking a long position. To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security. Similarly, purchasing a floorless convertible security is not, by itself or when coupled with short selling, inherently manipulative. Such securities provide distressed companies with access to much-needed capital and, so long as their terms are fully disclosed, can provide a transparent hedge against a short sale.

### B. Pleading Market Manipulation

-22-

Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange. See Schnell v. Conseco, Inc., 43 F. Supp. 2d 438, 448 (S.D.N.Y. 1999); Cowen & Co. v. Merriam, 745 F. Supp. 925, 929 (S.D.N.Y. 1990).

Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b). See Internet Law Library, Inc. v. Southridge Capital Mgmt., 223 F. Supp. 2d 474, 486 (S.D.N.Y. 2002); U.S. Envtl., 82 F. Supp. 2d at 239; see also Rooney Pace, Inc. v. Reid, 605 F. Supp. 158, 162-63 (S.D.N.Y. 1985) (applying Rule 9(b) to a market manipulation claim). A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim. See Internet Law Library, 223 F. Supp. 2d at 486; U.S. Envtl., 82 F. Supp. 2d at 240; cf. Romach, 355 F.3d at 175 n.10 (relaxing the standard where information was likely to be in the exclusive control of the defendants and analysts).

Accordingly, a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants. See In re Blech Sec.

Litig., 928 F. Supp. 1279, 1291 (S.D.N.Y. 1996) (adopting this test as set forth in the unpublished decision Baxter v. A.R. Baron & Co., No. 94 Civ. 3913, 1995 WL 600720 (S.D.N.Y. Oct. 12, 1995)); see also Compudyne Corp. v. Shane, 453 F. Supp. 2d 807, 821 (S.D.N.Y. 2006); U.S. Commodity Futures Trading Comm'n v. Bradley, 408 F. Supp. 2d 1214, 1222 (N.D. Okla. 2005) (market manipulation under the Commodity Exchange Act); Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 642 (S.D.N.Y. 2004); In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 372 (D. Md. 2004); Log On Am., Inc. v. Promethean Asset Mgmt., 223 F. Supp. 2d 435, 445 (S.D.N.Y. 2001); U.S. Envtl., 82 F. Supp. 2d at 240; In re Blech Sec. Litig., 961 F. Supp. 569, 580 (S.D.N.Y. 1997). But see Intelli-Check, 274 F. Supp. 2d at 629 (articulating requirements for a less stringent pleading standard in the Third Circuit). General allegations not tied to the defendants or resting upon speculation are insufficient. This test will be satisfied if the complaint sets forth, to the extent possible, "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Baxter, 1995 WL 600720, at *6; see also Miller v. Lazard Ltd., 473 F. Supp. 2d 571, 587 (S.D.N.Y. 2007); In re Sterling Foster & Co. Sec. Litig., 222 F. Supp. 2d 216, 270 (E.D.N.Y. 2002); Blech, 961 F. Supp. at 580. This standard meets the goals of Rule 9(b) while also considering

-24-

which specific facts a plaintiff alleging manipulation can realistically plead at this stage of the litigation.

Because a claim for market manipulation requires a showing of scienter, the PSLRA's heightened standards for pleading scienter also apply. Therefore, the complaint must plead with particularly facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities. See 15 U.S.C. § 78u-4(b)(2); Section II.A, supra. This pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation.

### C. Manipulation by the Levinson Defendants, Wolfson, and Rose Glen

ATSI's allegations that the Levinson Defendants, Wolfson, and Rose Glen manipulated the market are based on (1) high-volume selling of ATSI's stock with coinciding drops in the stock price, (2) trading patterns around conversion time, (3) the stock's negative reaction to positive news, and (4) the volume of trades in excess of settlement during a 10-day period in 2003. We agree with the district court that these allegations are inadequate under Rule 9(b). In sum, ATSI has offered no specific allegations that the defendants did anything to manipulate the market; it relies, at best, on speculative inferences. Moreover, ATSI has failed to adequately plead scienter.

-25-

ATSI's complaint alleges high-volume selling between April 13, 2000 and April 18, 2000, resulting in a 44% decline in stock price. ATSI narrows the list of potential culprits to these defendants because ATSI's major shareholders said that they were not selling stock, leaving only the defendants with large enough blocks of shares to trade at the observed volumes. These allegations fail to state even roughly how many shares the defendants sold, when they sold them, and why those sales caused the precipitous drop in stock price. And the complaint is devoid of facts supporting ATSI's belief that these defendants had sufficient shares to engage in the high-volume trading alleged. Even though the complaint alleges trading volumes of up to 1.5 million shares per day, ATSI reported in its April 14, 2000 Form S-3 that the Shaar Fund held only 492,308 shares of its common stock. The complaint and relevant documents do not reveal how many shares Wolfson and Rose Glen held. ATSI argues that the Shaar Fund's 3,000 shares of Series D Preferred Stock were eventually converted into 8.3 million common shares – sufficient to support the observed trading volumes. This allegation does not help ATSI, however, because the complaint states that the Shaar Fund did not begin converting those preferred shares until December 12, 2000, many months after the high-volume selling.

The complaint then alleges that there was a drop in ATSI's stock price in the days leading up to the defendants' conversion of the Preferred Stock. It alleges that in the absence of

manipulation, (1) the Reference Price for conversion should approximate the average price during the 30 days prior to the look-back period and (2) that trading volumes during the look-back periods should have been equal to the average for the previous quarter. We agree with the district court's view that ATSI's "position is ludicrous." ATSI Commc'ns, 357 F. Supp. 2d at 719. One does not observe constant prices or trading volumes in the stock markets. Cf. Cent. Nat'l Bank of Mattoon v. U.S. Dep't of Treasury, 912 F.2d 897, 902 (7th Cir. 1990) ("[T]he value of a company is rarely constant over an entire year . . . .").

The complaint next alleges that manipulation may be inferred from the stock's negative reaction to positive news. The district court was mistaken in dismissing this circumstance on the grounds that "the announcement concerns events with no apparent connection to the defendants or this case." ATSI Commc'ns, 357 F. Supp. 2d at 719. The premise of ATSI's theory is that an issuer's stock price, in the absence of manipulation, should increase when good news is announced.[5] Under such a

---

[5] The strength of this broad proposition is questionable. Cf. United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991) ("[W]hether a public company's stock price moves up or down or stays the same after the filing of a Schedule 13D does not establish the materiality of the statements made, though stock movement is a factor the jury may consider relevant."). For example, the stock price may not move if the market already knew about the good news, or if the market believes the news is overblown or false, or if adverse developments in the company or industry are anticipated or rumored.

theory, the subject of the news and the defendants do not need to be connected.

Nevertheless, this allegation cannot save the complaint because ATSI pleads no particular connection between the negative reaction of the stock price and anything the defendants did. Adopting ATSI's reasoning would subject large holders of convertible preferred stock to the risk of suit under § 10(b) whenever the stock price does not react to news as the issuer expects. See Rombach, 355 F.3d at 171 (stating that Rule 9(b) serves, inter alia, to safeguard a defendant's reputation from improvident charges of wrongdoing and protect him against strike suits).

Finally, the complaint rests on an inference of manipulation based upon Depository Trust Company records showing that 8,256,493 shares were traded in excess of settlements during the 10-day period before the AMEX suspended trading of ATSI's stock. Trading volume increased over this period, yet the percentage of trading volume that settled decreased. ATSI claims that the only plausible explanation is that the trades did not result in any change in beneficial ownership, indicating "wash trades, matched trades, phantom shares, and other manipulative trading."

The inference ATSI asks us to draw is too speculative even on a motion to dismiss. See Segal v. Gordon, 467 F.2d 602, 606, 608 (2d Cir. 1972) (holding that "distorted inferences and speculations" could not meet Rule 9(b)'s requirements). Nowhere

does ATSI particularly allege what the defendants did - beyond simply mentioning common types of manipulative activity - or state how this activity affected the market in ATSI's stock. This data could easily be the result of internal settlements within broker-dealers that do not involve the Depository Trust Company. Manipulation is also unlikely given that ATSI's closing share price during this period started at $0.08 per share and ended at $0.08 per share.

For similar reasons, none of these allegations, nor anything else in the complaint, meets the PSLRA's requirements for pleading scienter. See 15 U.S.C. § 78u-4(b)(2). A strong inference of scienter is not raised by alleging that a legitimate investment vehicle, such as the convertible preferred stock at issue here, creates an opportunity for profit through manipulation. See Ganino, 228 F.3d at 168-69. These circumstances are present for any investor in floorless convertibles. Cf. Chill v. Gen. Elec. Co., 101 F.3d 263, 267 & n.5 (2d Cir. 1996) (holding that a generalized motive that an issuer wishes to appear profitable, which could be imputed to any public for-profit enterprise, was insufficiently concrete to infer scienter); In re Alstom SA Sec. Litig., 454 F. Supp. 2d 187, 197 (S.D.N.Y. 2006) (stating a similar proposition for corporate insiders). Accordingly, there is a "plausible nonculpable explanation[]" for the defendants' actions that is more likely than any inference that the defendants intended to

manipulate the market, see Tellabs, 2007 WL 1773208, at *10: ATSI and the defendants simply entered into mutually beneficial financing transactions. Further, because ATSI has not adequately pled that the defendants engaged in any short sales or other potentially manipulative activity, there is no circumstantial evidence of manipulative intent. See Ganino, 228 F.3d at 168-69. Accordingly, more specific allegations are required.

### D. Manipulation Claims Against Trimark

The complaint is plainly insufficient in alleging that Trimark engaged in market manipulation.[6] It only alleges that Trimark was the principal market maker in ATSI's stock, that Trimark knew or should have known of the manipulation, and that ATSI "believes" that Trimark was a cooperating broker-dealer. Wholly absent are particular facts giving rise to a strong inference that Trimark acted with scienter in manipulating the market in ATSI's common stock and any allegations of specific

---

[6] Rose Glen and Trimark also argue that ATSI lacks standing to bring a Rule 10b-5 claim against them because ATSI sold its Preferred Stock and warrants to the defendants in primary market transactions and did not transact in the allegedly manipulated secondary market. Because ATSI's complaints do not meet the pleading requirements, we choose not to reach this statutory standing question. See Coan v. Kaufman, 457 F.3d 250, 256 (2d Cir. 2006) ("Unlike Article III standing, which ordinarily should be determined before reaching the merits, statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action." (citations omitted)); see also Official Comm. Of Unsecured Creditors of Worldcom, Inc. v. SEC, 467 F.3d 73, 80-81 (2d Cir. 2006); cf. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 97 n.2 (1998).

acts by Trimark to manipulate the market, much less how those actions might have affected the market.

**III. ATSI's Misrepresentation Claims**

To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. Lentell, 396 F.3d at 172. The district court properly dismissed the misrepresentations claims.

**A.    Levinson Defendants and Wolfson**

Of the misrepresentations that ATSI claims, we can quickly dispose of all except the two alleged in the transaction agreements. The Registration Rights agreement between ATSI and the Shaar Fund plainly states that the only promises, restrictions, and warranties to the transaction were those set forth in the transaction documents. Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation. See Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 343 F.3d 189, 196 (2d Cir. 2003); Dresner v. Utility.com, Inc., 371 F. Supp. 2d 476, 491-93 (S.D.N.Y. 2005). By engaging in these private placements of complex securities,

-31-

ATSI is clearly a sophisticated investor. Accordingly, to the extent ATSI's causes of action are based on alleged misrepresentations made during negotiations preceding the defendants' investment, those claims are barred by the merger clauses.

## 1. Promise Not to Short Sell

The complaint alleges, on information and belief, a fraudulent misrepresentation by the Shaar Fund in promising, in the Securities Purchase Agreement, not to enter a short position prior to closing or cover a short position entered into prior to execution of the agreement using converted common stock. The complaint fails to sufficiently allege that this representation was false when made. While the failure to carry out a promise in connection with a securities transaction might constitute breach of contract, it "does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." Gurary, 190 F.3d at 44 (internal quotation marks omitted). The speculative allegations that the Levinson Defendants and Wolfson engaged in short selling are deficient for the same reasons that they did not establish manipulation.

ATSI asks us to infer that the Levinson Defendants never intended to honor this promise because they had previously engaged in "death spiral" financing schemes, as evidenced by the declining stock prices of unspecified companies in which they

-32-

invested. These allegations fail Rule 9(b)'s requirement of stating with particularity why the statement was fraudulent and the PSLRA's requirement of stating the facts on which a belief is based. The complaint does not specify which companies experienced a decline in share price or when they experienced the decline (other than that they occurred within 1 year of an unspecified time of investment). It also fails to allege with particularity what, if anything, the defendants did to cause the decline; it simply offers a generalized allegation that the defendants engaged in death spiral financing combined with a detailed definition of how death spiral financing works. Cf. United States ex rel. Walsh v. Eastman Kodak Co., 98 F. Supp. 2d 141, 147 (D. Mass. 2000) (holding that fraud was not adequately pled under Rule 9(b) where the plaintiff only alleged a method by which the defendants could produce false invoices without specifying instances of false claims arising from false invoices). Holding otherwise would expose investors in start-ups and risky, distressed companies to fraud claims based solely on the (unsurprisingly) poor performance of their portfolios. See Rombach, 355 F.3d at 171.

In response, ATSI argues that it adequately identified the defendants' victims by detailing how the companies could be found by searching the SEC's publicly-available Edgar database. It also contends that the defendants have personal knowledge of what

investments they made and when the stock prices of those investments declined.

ATSI cannot sufficiently plead fraud by simply providing a method for the defendant to discover the underlying details. If ATSI had access to the details necessary to make these allegations, it must plead them and not just tell the defendants to go find them.

We also reject ATSI's argument that it adequately pled fraud by pointing to the drop in the stock prices of the defendants' other investments because that information is relevant under Fed. R. Evid. 404(b) and 406 and supports "a reasonable inference of fraud." No inference of sabotage is available from the circumstance that some (or many) risky investments come to nothing. Moreover, the allegations fail to point to any specific actions by the defendants with respect to those investments and thus fail to establish that the defendants' promise was fraudulent. To the extent the Southern District of New York's decision in Internet Law Library, 223 F. Supp. 2d 474, is to the contrary, we reject it.

### 2. Investor Profile Representation

ATSI also claims that the representation in the Securities Purchase Agreement that the Shaar Fund was an accredited investor was fraudulent. The complaint does not sufficiently allege loss causation with respect to this misrepresentation. A plaintiff is required to prove both transaction causation (also known as

-34-

reliance) and loss causation. <u>Lentell</u>, 396 F.3d at 172; <u>see also</u> 15 U.S.C. § 78u-4(b)(4). Transaction causation only requires allegations that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." <u>Lentell</u>, 396 F.3d at 172 (quoting <u>Emergent Capital</u>, 343 F.3d at 197). Loss causation, by contrast, is the proximate causal link between the alleged misconduct and the plaintiff's economic harm. <u>See</u> <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 346 (2005); <u>Lentell</u>, 396 F.3d at 172. To that end, the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement. <u>See</u> <u>Lentell</u>, 396 F.3d at 173.

The complaint alleges losses (1) through the tremendous decline in ATSI's share price, impairing its access to capital and its viability as a business; and (2) by ATSI's sale of its own stock at depressed prices. It fails, however, to establish any causal connection between those losses and the misrepresentation that the Shaar Fund was an accredited investor. In what appears to be an attempt to meet <u>Lentell</u>'s requirements, ATSI contends that it adequately pled loss causation because the Levinson Defendants made this misrepresentation to induce ATSI to enter into the transaction under the pretense that they were "trustworthy, reputable and long-term investor[s]," and that when the true risk of their plans materialized through their

-35-

manipulative acts, ATSI suffered losses. This allegation might support transaction causation; it fails, however, to show how the fact that the Shaar Fund was not an accredited investor caused any loss. See id. at 174 ("Such an allegation - which is nothing more than a paraphrased allegation of transaction causation - explains why a particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment." (internal quotation marks omitted)).

ATSI is wrong in claiming that these allegations are sufficient to establish loss causation under our decision in Weiss v. Wittcoff, 966 F.2d 109 (2d Cir. 1992) (per curiam). In Weiss, the plaintiff agreed to merge his business with the defendant's on the latter's representation that his other company would supply goods and services. Id. at 110. When the defendant sold his other company a year after the transaction, id. at 110, 112, the plaintiff's business suffered subsequent losses from higher costs, id. at 110-11. We held that the complaint adequately pled loss causation because the plaintiff's losses were "clearly a proximate result of his reliance on defendants' promises, since defendants' failure to fulfill those promises foreseeably caused [the business's] financial condition to deteriorate." Id. at 111.

Weiss is easily distinguishable. There, the complaint established a causal connection between (1) the promise to provide for the business's needs and (2) the business's increased

-36-

costs when the promise turned out to be false.  See <u>id.</u>  ATSI, by contrast, fails to show that the subject of the fraudulent statement proximately caused any loss.  See <u>Lentell</u>, 396 F.3d at 173 ("Thus to establish loss causation, 'a plaintiff must allege . . . that the <u>subject</u> of the fraudulent statement or omission was the cause of the actual loss suffered . . . .'" (alteration in original)).

### B.   Misrepresentations by Rose Glen

The misrepresentations attributed to Rose Glen suffer from largely the same defects as those against the Levinson Defendants.  ATSI cannot claim reliance on Rose Glen's pre-contractual, verbal representations because of the merger clause in the Registration Rights Agreement.

The only representation in the Securities Purchase Agreement that merits discussion is the one in which Rose Glen represented that it was purchasing the Preferred Stock:

> for its own account and not with a present view towards the public sale or distribution thereof except pursuant to sales registered or exempted from registration under the 1933 Act; <u>provided, however</u> that by making the representation herein, the Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act.

In addition to failing to plead falsity under <u>Gurary</u>, ATSI's complaint fails to plead that Rose Glen even broke this promise, much less that it secretly intended to break it.

ATSI also alleges that Rose Glen engaged in a bait-and-switch scheme by first promising in its draft term sheet to invest $10 million, then offering only $2.5 million at closing. The district court properly dismissed this claim. First, it is time-barred. Prior to the passage of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002), the statute of limitations required that a Rule 10b-5 claim be brought within one year of discovery of the facts constituting the violation and within three years of the violation. Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991). ATSI learned of the alleged falsity of this representation when it signed the closing documents on October 16, 2000, but did not commence its action against Rose Glen until October 31, 2002 – more than two years later. See LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003) (stating that the limitations period begins to run, inter alia, after the plaintiff receives actual knowledge of the facts giving rise to the action). Second, ATSI has not pled falsity or reliance because the term sheet expressly stated that Rose Glen's "obligation to fund is subject to satisfactory due diligence, in RGC's sole discretion."

### C.   Misrepresentations by CCM

ATSI claims that CCM made misrepresentations very similar to those alleged against Rose Glen. Largely for the same reasons as above, the district court properly dismissed those claims.

**IV. Control Person Liability**

ATSI alleges control person liability under § 20(a) against the Levinson Defendants, Wolfson, Rose Glen, and the Citco Defendants. To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. First Jersey, 101 F.3d at 1472. ATSI fails to allege any primary violation; thus, it cannot establish control person liability.

**V. Leave to Amend**

ATSI argues that even if the district court properly dismissed its complaints under Fed. R. Civ. P. 12(b)(6), it should have granted leave to amend. We review a district court's denial of leave to amend for abuse of discretion. Grace v. Rosenstock, 228 F.3d 40, 54 (2d Cir. 2000). In ATSI I, ATSI submitted three amended complaints; in ATSI II, it submitted a complaint largely identical to ATSI I's third amended complaint. The district court had already dismissed ATSI I's first amended complaint for failure to meet Rule 9(b) and the PSLRA's pleading requirements on many grounds similar to its final dismissal. District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b). See Luce, 802 F.2d at 56. ATSI was

-39-

given that opportunity.  The district court did not abuse its discretion in declining to grant further leave to amend.

**CONCLUSION**

For the foregoing reasons, the judgments of the district court are AFFIRMED.