**IN RE: EZCORP, INC. SECURITIES LITIGATIONS.**

14 Civ. 6834, 14 Civ. 8349.

United States District Court,
S.D. New York.

Signed 03/31/2016

## MEMORANDUM & ORDER

ANDREW L. CARTER, JR., District Judge

### I. INTRODUCTION

Purchasers of common shares of the financial services corporation EZCORP, Inc. ("EZCorp") bring a class action complaint for securities fraud. They accuse EZCorp's senior executives and sole shareholder of voting stock, Phillip Ean Cohen, of artificially inflating the company's value by misrepresenting its profitability, corporate decisionmaking process, and compliance with lending regulations.

The shareholders sue EZCorp and the executives for violations of Section 10(b) of the Securities Exchange Act (the "Exchange Act") and its implementing regulation, SEC Rule 10b-5. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security[,] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b)). Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact." 17 C.F.R. § 240.10b–5(b).

Separately, under Section 20(a) of the Exchange Act, the shareholders sue the executives, Cohen, and Cohen's corporation MS Pawn, which itself owns EZCorp's

voting stock, for the same alleged misrepresentations. Section 20(a) makes a "controlling person" of a company secondarily liable for their company's violations of the Exchange Act. 15 U.S.C. § 78t(a).

The executives move to dismiss for failure to adequately plead misrepresentation, scienter, and loss causation. Cohen and the executives also jointly move to dismiss for failure to plead control person liability. For the reasons herein, the motions to dismiss are granted in part and denied in part. Specifically, the claims of misrepresentation related to compliance with lending regulations against the executives and EZCorp survive, as do the control person liability claims against all defendants. All other claims are dismissed.

## II. BACKGROUND

This suit concerns purchases of EZCorp common stock made between April 19, 2012 and October 6, 2014 (the "class period"). First Amended Complaint ("FAC") at 1. EZCorp is a Texas-based corporation that owns and operates pawn shops and provides short-term consumer loans to individual customers. Id. ¶ 33. During the class period, EZCorp's leadership included chief executive officer Paul Rothamel and chief financial officer Mark Kuchenrither (collectively, "the executives"). Id. ¶¶ 14-15.

In that same period, Phillip Ean Cohen was the sole general partner of MS Pawn Limited Partnership ("MS Pawn"), EZCorp's sole shareholder of all voting stock. Id. ¶ 17. Cohen was thus the beneficial owner of the voting stock. Id. He also had access to all reports and information available to the EZCorp Board and used his voting authority and this information to control EZCorp's policies and decisions requiring a shareholder vote. Id. ¶¶ 17, 241. Cohen also owns the financial services consulting agency Madison Park. Id. ¶ 36. During the class period, EZCorp paid

Madison Park $20.2 million for consulting services, deals which EZCorp's executives assured investors were objectively evaluated and approved. Id. ¶ 38.

On the first day of the class period, EZCorp acquired the United Kingdom-based online lender Cash Genie. Id. ¶ 40. Throughout that same period, Cash Genie engaged in a number of lending practices that are banned by the UK's Financial Conduct Authority ("FCA"). Id. ¶ 57. Those practices included excessively and automatically charging interest alone on consumer loans, leaving the untouched principal to acquire more interest, referred to as "rolling over." Id. ¶ 60. An account manager at Cash Genie in 2013 recalls a loan that was rolled over more than 30 times. Id. ¶¶ 21, 61. Another account manager employed from December 2010 to November 2013 states that managers gave authorization to indefinitely roll over accounts and that employees were incentivized to do so by the payment of commissions. Id. ¶¶ 27, 63. Other improper collection practices alleged include "double logging," or contacting consumers with outstanding debts and pretending to be another lender in an effort to obtain new credit card information, id. ¶ 67; and adding unauthorized interest charges without any oversight by management, id. ¶ 73.

FCA rules explicitly banning such practices entered into force on July 1, 2014, about three months before the end of the class period. Id. ¶ 57. But as early as February 2012 the Office of Fair Trading ("OFT"), the FCA's regulatory predecessor, announced its intention to audit consumer credit companies for compliance with published guidance on irresponsible lending practices. Id. ¶ 49. By statute, the practices described by the published guidance were considered "deceitful, oppressive, or otherwise unfair or improper" and thus grounds for rescinding a lender's re-

quired consumer credit license. Id. ¶ 44. The guidance prohibited "[r]epeatedly rolling over a borrower's existing short-term loan in a way that was unsustainable or otherwise harmful" and "[f]ailing to establish and implement clear and effective policies and procedures for the reasonable assessment of affordability." Id. ¶ 45. In March 2013 the FCA announced that widespread evidence of abusive lending practices merited imposing an absolute limit on rollovers to two occasions. Id. ¶ 53. The FCA published proposed rules capping rollovers in December 2013, id. ¶ 53, and final rules doing the same in February 2014, id. ¶ 57.

The shareholders identify three topics about which they claim EZCorp executives made materially false and misleading statements or omissions: (1) the operational practices of Cash Genie; (2) the process by which Madison Park's consulting contract with EZCorp was approved; and (3) financial reporting by EZCorp during the class period. Id. ¶ 75. Regarding the first topic, the shareholders identify specific statements of Rothamel and Kuchenrither made during conference calls with investors on April 19, 2012, April 30, 2013, July 30, 2013, and April 29, 2014 that Cash Genie lending practices met or exceeded industry best practices and complied with UK regulations. Id. ¶¶ 42, 58, 85, 87. On the April 19 call, Rothamel explicitly disclaimed that Cash Genie engaged in unfair and deceptive practices. Id. ¶ 79. On the July 30 call, Kuchenrither stated that EZCorp "purposely took the time to put in best practices and implemented the best practices" in Cash Genie's operations. Id. ¶ 88. Yet on November 7, 2013, Rothamel disclosed during an investor conference call that Cash Genie "did not operate to best practices" and instead suffered from "sub-standard execution related to underwriting and collections." Id. ¶ 90. As a result, EZCorp made "corrections" to

Cash Genie's practices and had "cleaned up" its operations, focusing on the "underwriting and on the collection side." Id On January 28, 2014, Rothamel again stressed that EZcorp had "rectified" Cash Genie operational compliance with regulations. Id. ¶ 91.

Regarding the approval of the Madison Park consulting contract, the shareholders allege that contrary to EZCorp's public statements that the contract was objectively vetted and approved, it was instead singlehandedly forced upon EZCorp through the use of Cohen's shareholder voting authority. Id. ¶ 97. As a result, Cohen reaped tens of millions of dollars in consulting fees in a deal that was commercially disadvantageous to EZCorp. Id. The shareholders identify statements of the executives on Forms 8-K filed with the Securities and Exchange Commission ("SEC") on October 4, 2012 and October 15, 2013 that the Madison Park contract was "considered, analyzed, negotiated, and approved objectively." Id. ¶¶ 98, 102. The same statement was repeated in Forms 10-K filed with the SEC on November 20, 2012 and November 27, 2013. Id. ¶¶ 101, 103. On May 21, 2014 EZCorp announced that it had terminated its agreement with Madison Park. Id. ¶ 171. Less than two months later, in July 2014, EZCorp announced changes in executive management. Id. The investors allege that Cohen unilaterally modified EZCorp's by-laws to allow him to stack EZCorp's executive board and constrict their ability to call special meetings. Id. ¶ 173. In the wake of EZCorp's executive shakeup and bylaw modifications, outside analysts published reports highlighting concerns with the degree of control exercised by Cohen over EZCorp. Id. ¶¶ 176-77.

Finally, the shareholders allege that from September 30, 2011 to December 31, 2012, EZCorp's financial or public state-

ments violated Generally Accepted Accounting Principles ("GAAP") and were thus presumptively misleading. Id. at 45. Specifically, published financial statements consistently overstated the fair market value of EZCorp's investment in the UK pawnbroker Albemarle & Bond ("A & B") by failing to take timely impairment charges. Id. ¶ 122. On April 29, 2014, EZCorp announced that its investment in A & B was permanently and fully impaired. Id. ¶ 144. The shareholders contend that compliance with GAAP required the executives to take timely impairment charges in financial reports between March 31, 2013 and December 31, 2013, which would have resulted in the gradual downward valuation of the A & B investment. Id. ¶ 146.

## III. DISCUSSION

### A. Legal Standard

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). On a motion to dismiss, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's favor. Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). But to satisfy Rule 12(b)(6), a plaintiff must offer "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010). Ultimately, on a motion to dismiss "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013) (internal quotations and citation omitted).

A complaint alleging securities fraud must also satisfy the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed.R.Civ.P. 9(b) by stating with particularity the circumstances constituting fraud. ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1), (2). Rule 9(b) likewise requires that the plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

### B. Analysis

The defendants dispute whether the shareholders have adequately stated claims for either misrepresentation or control liability. "To state a claim under Rule 10b-5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007). "To establish a prima facie case of control person liability, a plaintiff must

show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Id. at 108.

Applying these standards, the Court finds a misrepresentation claim stated regarding Cash Genie's compliance with lending regulations. It further finds control person liability claims stated against all defendants. Below, the Court explains why it reaches these conclusions.

### a. Misrepresentations
### i. The complaint adequately alleges misrepresentations related to Cash Genie's regulatory compliance.

 "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014) (internal quotations omitted). Puffery is frequently comprised of "statements [that] are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" Id. "The important limitation on these principles is that optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted ...." Lapin v. Goldman Sachs Grp., Inc., 506 F.Supp.2d 221, 239 (S.D.N.Y. 2006). Broadly speaking, then, the line into misrepresentation has been crossed when "defendants did more than just offer rosy predictions ...." Id. Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000).

 Under these principles, the executives' statements that they welcomed increasingly rigorous lending regulations are most properly characterized as puffery be-

cause they are not statements of present fact but rather expressions of optimism in the face of a changing regulatory environment. These include statements of optimism expressed in the July 24, 2012 conference call, when in response to a prompt to "give us an idea of ... any potential regulatory developments," Rothhamel generally stated that Cash Genie "operates in a way that we could flexibly handle whatever regulatory changes they may or may not throw at us" and that "over time, we think we benefit from more regulatory action" because of reduced competition. Fensterstock Declaration, Exh. 18 at 7. Similarly, the April 30, 2013 Form 8-K only generally mentioned Cash Genie's "efforts on the regulatory front ... [that] have been very successful[,]" FAC ¶ 85, eschewing any claims of specific actions taken. A reasonable investor could not rely on such general, even equivocal, statements.

 Nonetheless, certain statements describing Cash Genie's existing practices as compliant with regulatory and industry best practices qualify as misrepresentations. This is especially so when viewed in light of contemporaneous public announcements by UK regulatory authorities that referenced specific industry practices or defined emerging regulatory standards. When a shareholder asked Rothamel during an April 19, 2012 earnings call, for instance, if in light of "some of the work that the Office of Fair Trading is doing on rollovers and multiple pinging of accounts and things like that[,] ... the regulatory environment in the UK ... will remain favorable," he answered that question by disclaiming that Cash Genie engaged in unfair and deceptive practices. Fensterstock Declaration, Exh. 20 at 7. At the time the statement was made, UK authorities had recently announced their intention to scrutinize industry players for compliance with published guidelines on fairness

in lending. Cash Genie's alleged operating practices fell far short of those guidelines. The reasonable investor was entitled to assume that Rothamel was measuring Cash Genie's practices against the regulatory focus announced by OFT shortly before the April 19 call.

The same is true of the executives' statements in April 2013 that "recent OFT activity will not adversely impact the business, as Cash Genie has been following best practices guidelines for the past year," FAC ¶ 86, and July 2013 that "the best practices that we've put in place are what the OFT is requiring from all competition in the marketplace," id. ¶ 88, made shortly after the OFT announced in March 2013 its intention to cap rollovers to two occasions. While "generalizations regarding [a company's] business practices ... are precisely the type of puffery that this and other circuits have consistently held to be inactionable," ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009) (internal quotations omitted), the statements here were made on the heels of well publicized regulatory guidance about specific business practices. That context makes it reasonable to infer that the statements did not refer to generalized business practices alone.

■■■ That context is also why the executives' statements about regulatory compliance are not protected by either the "bespeaks caution" doctrine or the PSLRA's safe-harbor provision. "Under the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Rombach, 355 F.3d 164. "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).

The executives repeatedly cite cautionary language in their Forms 10-K and 8-K focused on the FCA's proposed and final regulations, but ignore statements made before that time period that were bereft of such cautionary language and at odds with the OFT's irresponsible lending guidelines. Further, Cash Genie's alleged operating practices included indefinite rollovers, with at least one account accumulating 30. Those numbers were so far a cry from the FCA's proposed and final regulations capping rollovers at two occasions that cautionary language claiming uncertainty as to whether Cash Genie would have to alter its practices in light of final regulations would plausibly have misled a reasonable investor.

■■■ The safe-harbor provision of the PSLRA exempts from liability "a forward-looking statement ... accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement ...." 15 U.S.C. § 78u-5(c). Again, the OFT's 2012 announcement of inspections of UK lenders, including Cash Genie, for compliance with published guidelines on responsible lending is the relevant touchstone by which to measure the executives' statements. The shareholders allege that Cash Genie's operating practices violated the OFT's 2012 guidelines. The statements on regulatory compliance are thus not forward-looking relative to the final regulations, but rather ones of present fact relative to the irresponsible lending guidelines.

They are therefore not protected by the PSLRA's safe harbor.

In sum, while statements welcoming increasingly rigorous regulation are most accurately classified as puffery, statements about upholding best practices made in the context of ongoing regulatory announcements that referenced specific industry standards are properly labeled misrepresentations.

### ii. The complaint fails to plausibly allege misrepresentations related to the approval of EZCorp's agreement with Madison Park.

■ The shareholders further accuse EZCorp's executives of lying about the objectivity of the approval process of a contract for services between the corporation and the consulting agency Madison Park, owned by the beneficial owner of all of EZCorp's voting stock, defendant Cohen. But they fail to allege facts about the approval process that make their allegation anything more than an unsupported legal conclusion.

The confidential witnesses relied on by the shareholders variously testify that they had "no idea what [Madison Park] did for the money," that the agreement was how Cohen "gets his money out of the company," and that they did not believe that there was any consulting going on between the companies. FAC ¶ 193. Assuming, without deciding, that these witnesses even had reliable personal knowledge about the approval process, none of the statements cited by the shareholders address it. Instead, the witnesses' statements speak of their own lack of knowledge of the services provided by Madison Park and their own opinions of Cohen's motivations for entering into the agreement. The shareholders also point to a November 2012 investment call wherein one of the executives did not answer part of an investor's compound question as to why EZCorp continued to pay for consulting services despite adopting a new growth strategy. Plainly speaking, it is unreasonable to construe that silence as an admission that the Madison Park agreement approval process was not objective, as the shareholders seek to do in their complaint.

Other facts offered in the complaint also weigh against the plausibility of the shareholders' accusations of a compromised approval process. The shareholders point to Cohen's role as the sole voting shareholder as almost per se proof that the Madison Park agreement could not have been objectively approved. Yet they concede that the EZCorp board possessed enough independence to terminate the agreement when it determined that it was no longer in the corporation's best interests. Even if the subsequent replacement of the board members by Cohen's vote were related to that termination, that post-hoc restructuring occurred a year after the Madison Park agreement had last been approved. It thus says little, if anything, about the approval process itself.

Without sufficient facts to support its legal conclusion that the executives misrepresented the approval process for the Madison Park agreement, the shareholders' claim of such must be dismissed.

### b. Scienter

■ Under the PSLRA's "heightened pleading standard, a plaintiff must plead facts to support a *strong* inference of scienter, 15 U.S.C. § 78u–4(b)(2), that is, the 'inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" Slayton v. Am. Exp. Co., 604 F.3d 758, 773 (2d Cir. 2010) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis in original).

A strong inference of scienter "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006). Strong circumstantial evidence includes a showing that defendants (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 199 (2d Cir. 2009). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak v. Kasaks, 216 F.3d 300, 309.

Finally, "it is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). In this scenario, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Id.

While the complaint adequately alleges scienter regarding the Cash Genie allegations, it fails to do so regarding allegations of fraud in EZCorp's financial statements.

**i. The complaint adequately alleges scienter regarding misrepresentations of Cash Genie's regulatory compliance.**

The shareholders provide no argument that the executives possessed a motive and opportunity to commit fraud. Instead, they stake their scienter claim on the executives' recklessness. Specifically, they argue that the executives had access to information on Cash Genie's operating practices suggesting that their public statements about the same were not accurate. That allegation is bolstered by several confidential witnesses, including a Cash Genie financial manager from September 2011 to March 2014 who worked in financial reporting compliance and collections. The manager supervised an employee who prepared monthly Management Packs for the executives, which included discussions of lack of oversight of collection practices. FAC ¶ 188. The manager specifically recalls seeing Kuchenrither's name on emails circulating the management packs. Id. That same manager participated in a December 2012 call with Kuchenrither in which Cash Genie's managerial oversight deficiencies were discussed. Id. ¶ 190. An additional witness, the Interim Vice President of Cash Genie form December 2013 to May 2014, confirms that the Management Packs were produced monthly and contained information on "internal control issues." Id. ¶ 189. In that witness's opinion, the Management Packs "would definitely be shared with Mark [Kuchenrither]." Id. A Cash Genie Operations Manager from August 2010 to December 2013 who worked "side-by-side" with EZCorp's Vice President of Operations also avers that monthly audits detailing Cash Genie's lax management practices were collaboratively prepared by the auditing team and sent to the executives. Id. ¶¶ 23, 199. Also supporting a finding of scienter is the collective picture painted by the confidential witnesses: a culture of unscrupulous lending practices and lax oversight that was so widespread as to be "a matter of course," id. ¶ 73—one that the shareholders allege

eventually led to the abandonment of EZCorp's affiliation with Cash Genie due in part to its inability to meet "regulatory challenges." Id. ¶ 96(a). See Cornwell v. Credit Suisse Grp., 689 F.Supp.2d 629, 637 (S.D.N.Y. 2010) (finding scienter properly alleged where there was "widespread knowledge ... of the company's problems with valuation, risk management and internal controls.")

Further, Rothamel himself made public statements regarding the executives' studied familiarity with Cash Genie's operational practices. In a January 22, 2013 conference call with investors, Rothamel stated that EZCorp had studied Cash Genie for over two years before deciding to invest. Id. ¶ 190. That lengthy due diligence period could plausibly have given the executives ample information on Cash Genie's company-wide, allegedly improper collection practices.

The executives overstate their counter-case when attacking the reliability of the confidential witnesses, incorrectly arguing that not one of them had any direct contact with the executives. The financial manager's December 2012 conference call discussion with Kuchenrither about Cash Genie's oversight deficiencies qualifies as personal contact. Cf. In re Wachovia Equity Sec. Litig., 753 F.Supp.2d 326, 352 (S.D.N.Y. 2011) (finding unreliable allegations of confidential witnesses that had never "met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period."). Moreover, the complaint's descriptions of monthly Management Packs and audit reports prepared by auditing teams and sent to executive leadership, including Kuchenrither, satisfy the Second Circuit's standard for securities fraud pleading "by specifying who prepared internal company reports, how frequently the reports were

prepared and who reviewed them." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 73 (2d Cir. 2001).

In short, "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter" on the parts of the executives. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis in original). Their scienter may also be imputed to EZCorp itself for primary violator liability.

**ii. The complaint fails to allege scienter regarding misrepresentations related to financial reporting.**

■■■ With limited exceptions, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate ...." 17 C.F.R. § 210.4–01(a)(1). Nonetheless, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." Novak v. Kasaks, 216 F.3d 300, 309 (internal quotations and citations removed).

■■■ Once again, the shareholders attempt to show scienter through the executives' access to information suggesting that their public statements were not accurate. Specifically, they argue that when the executives filed a May 10, 2013 Form 10-Q that recorded their investment in A & B, they used A & B's stock price as recorded on March 31, 2013. Yet as early as April 19, 2013, A & B had disclosed that its projected profits for the fiscal year ending June 30 were markedly below expectations, sending its stock price tumbling 30% lower than the price EZCorp recorded on its Form 10-Q. Not until November 2013, six months later, did the executives finally record an impairment charge. The shareholders contend that the November im-

pairment charge was based entirely on information made public in April 2013: A & B's diminished profit projections. But they fail to account for an additional event that EZCorp considered when deciding to record the impairment charge in November 2013: "In early October 2013, Albemarle & Bond announced that discussions to underwrite an equity funding had failed and they were in ongoing discussions with their banks to negotiate covenants." November 27, 2013 Form 10-K, Fensterstock Declaration, Exh. 4 at 12.

■ Matched against this unchallenged fact, the shareholders fail to allege an inference of scienter at least as compelling as EZCorp's opposing explanation: the loss of its investment in A & B was not reasonably certain until underwriting discussions had failed. After that failure was announced in October, EZCorp promptly recorded an impairment charge in November. "The fact that a financial item is accounted for differently, or in a later period, does not support an inference that a previously filed financial statement was fraudulent. This is an allegation of fraud by hindsight, which is insufficient to withstand a motion to dismiss." In re Fannie Mae 2008 Sec. Litig., 742 F.Supp.2d 382, 409 (S.D.N.Y. 2010) (citing Slayton v. Am. Express Co., 604 F.3d 758, 776 (2d Cir. 2010); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129–30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.").

Because the shareholders fail to allege an inference of scienter at least as compelling as the opposing inference of nonfraudulent intent, their claim of fraud for GAAP violations must be dismissed.

### c. The complaint adequately alleges loss causation regarding misrepresentations surrounding Cash Genie's regulatory compliance.

■ Loss causation is properly alleged where the facts in a complaint plausibly indicate that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005). The loss causation pleading standard is "not meant to impose a great burden upon a plaintiff[,]" and may be met with " 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting Fed. Rule Civ. Proc. 8(a)(2)). One way to meet it is by alleging "a 'corrective disclosure to the market' that 'reveal[s] ... the falsity of prior recommendations.' " In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 40 n.5 (2d Cir. 2009) (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 n.4 (2d Cir. 2005)). But "a corrective disclosure is not necessary where ... plaintiffs allege that the subject of the misrepresentations and omissions caused their loss." In re Parmalat Sec. Litig., 375 F.Supp.2d 278, 306 (S.D.N.Y. 2005).

■ It is thus unnecessary for the Court to determine whether the executive's statements in conference calls that Cash Genie did not operate to best practices qualify as corrective disclosures of earlier statements to the contrary. The shareholders meet the loss causation pleading standard because they allege that the executives' misrepresentations about Cash Genie's operating standards concealed an investment risk. That risk materialized when UK regulatory authorities audited Cash Genie, began enforcing

preexisting lending standards, and proposed even more rigorous standards that Cash Genie could not meet. When investors found out that Cash Genie did not operate to the best standards that EZCorp had previously claimed it did, but instead might be forced to take "remediation actions, including payments to customers," FAC ¶ 169, the value of EZCorp shares fell significantly, id. ¶¶ 167, 170. The shareholders thus adequately allege loss causation related to misrepresentations regarding Cash Genie's regulatory compliance.

### d. The complaint adequately alleges control liability against all defendants.

 "It is well-established that, to state a claim for 'control person' liability under Section 20(a), a plaintiff must, at a minimum, plead: (1) a primary violation by the controlled person and (2) control of the primary violator by the defendant." Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F.Supp.3d 401, 437 (S.D.N.Y. 2014). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b–2).

 The Second Circuit has repeatedly stated that "culpable participation" is the third element of a prima facie control liability case, see e.g. Shaar Fund, Ltd., 493 F.3d 87, 108 (citing S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)), and even applied it at the pleadings stage on review of a motion to dismiss, Suez Equity Inv'rs, L.P. v. Toronto–Dominion Bank, 250 F.3d 87, 101 (2d Cir.

2001). But it has yet to explicitly define the meaning of the term.

In that vacuum, district courts in the Second Circuit are split as to what, exactly, a "culpable participation" allegation requires. See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F.Supp.3d 401, 437 n.19 (S.D.N.Y. 2014) (collecting cases). The majority of courts require pleading facts that support an individualized inference of the control person's scienter. As Judge Ramos explained in Special Situations, "[b]ecause Section 20(a) liability requires an individualized determination of the defendant control person's particular culpability, it stands to reason that an allegation of 'culpable participation' requires particularized facts of the *controlling person's* conscious misbehavior or recklessness." Id. at 438 (emphasis in original) (internal quotations and alterations removed). Id. at 438. On the opposite side of the debate, others have reasoned that "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity." In re Parmalat Sec. Litig., 414 F.Supp.2d 428, 440 (S.D.N.Y. 2006).

Both sides have their weak points. The minority, notice pleading standard seems to read out the "culpable participation" prong entirely, in essence requiring only (1) a primary violation and (2) "control." Or, as one case applying the standard put it, "[n]aked allegations of control ... will typically suffice ...." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F.Supp.2d 163, 190 (S.D.N.Y. 2006). On the other hand, the majority standard lacks a textual basis in Section 20(a) of the Exchange Act. See Lapin v. Goldman Sachs Grp., Inc., 506 F.Supp.2d 221, 248 (S.D.N.Y. 2006) ("The statute plainly imposes liability on a controlling person for any primary violation, unless the controlling person acted in good

faith and did not induce the action."); In re Parmalat Sec. Litig., 375 F.Supp.2d at 308 ("The interpretation most consistent with the text is that the defendant bears the burden of establishing good faith and lack of inducement, not that the plaintiff must allege the opposite in its pleadings."). The majority standard thus "assume[s] that [because] 'culpable participation' requires *proof* of a certain state of mind, ... plaintiffs must *plead* scienter .... This assumption has been made despite the fact that the Second Circuit has never defined 'culpable participation' or equated that term with scienter." In re Initial Pub. Offering Sec. Litig., 241 F.Supp.2d 281, 393 (S.D.N.Y. 2003) (emphasis in original) (internal citations removed).

Those courts applying the minority standard have noted that when the Second Circuit did apply the "culpable participation" prong on review of a motion to dismiss, it declined to discuss the control defendant's mental state at all. See In re WorldCom, Inc. Sec. Litig., 294 F.Supp.2d 392, 415 (S.D.N.Y. 2003) (stating that under the Second Circuit's own application of the "culpable participation" prong, "it does not appear that there is any requirement that the plaintiff plead or prove a culpable state of mind to allege or establish culpable participation") (citing Suez Equity Inv'rs, L.P. v. Toronto–Dominion Bank, 250 F.3d at 101). In Suez, the Second Circuit found a control person claim stated where "[t]he complaint alleges that [the defendant] was an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants .... While somewhat broad, this allegation is sufficient to plead controlling-person liability for the Bank derived from [the defendant], the purported primary violator." But the Suez plaintiffs had described the officer's mental state in their primary violator claim. The case may thus be limited to fact patterns in which a control person claim is alleged against a corporate defendant. After all, as a purely legal creation, "[a] corporation can only act through its employees and agents," Suez, 250 F.3d at 101, so it makes sense, in those cases, to look to the mental state of the agent for the corporation's "culpable participation."

This is not one of those cases, because the complaint here alleges a claim against a corporate defendant and its executives as primary violators and then seeks to impose control liability on the executives, Cohen as the sole voting shareholder, and the corporation he owns that holds EZCorp's voting stock, MS Pawn. The claims against the executives survive even the majority heightened pleading standard, because the shareholders described their mental states with particularity in their primary violator case. The only facts alleged to support the claims against Cohen and MS Pawn, however, are Cohen's status as sole voting shareholder, the broad allegation that he "participated in the management and day-to-day operations of EZCorp," and the consulting services that Madison Park rendered for EZCorp. FAC ¶¶ 240-41. Yet on facts substantially similar to these, Judge Swain found a control person claim alleged under the majority standard, assuming without deciding that it applied. See In re Pfizer Inc. Sec. Litig., 584 F.Supp.2d 621, 641 (S.D.N.Y. 2008) ("Finally, Plaintiffs' allegations that [the defendants] participated directly in the day-to-day management of Pfizer and made strategic decisions is [sic] sufficient to meet Plaintiffs' pleading obligation as to culpable participation.").

Considering the well-reasoned arguments on both sides of an unsettled issue of law, and valuing consistency and predictability amongst the district courts in the absence of a definitive ruling by the Second Circuit, the Court finds the control

214

person claims against Cohen and MS Pawn adequately alleged. The primarily violation of misrepresentation of Cash Genie's compliance with lending regulations is alleged as explained above. "Control" is alleged by Cohen's position as the sole beneficial owner of EZCorp's voting stock through his ownership of MS Pawn. Cf. Dietrich v. Bauer, 126 F.Supp.2d 759, 765 (S.D.N.Y. 2001) adhered to on reconsideration, 2001 WL 536971 (S.D.N.Y. May 21, 2001) ("The sole shareholder of the company that is the primary wrongdoer has been held to be a control person within the meaning of Section 20(a), as ownership strongly suggests that the defendant has the potential power to influence and direct the activities of the wrongdoer.") And the allegation of Cohen's participation in management, which included access to "all reports, agendas, and other information available to the EZCorp Board," FAC ¶ 241, suffices to particularly allege access to information suggesting recklessness, and thus "culpable participation" under even the most rigorous pleading standard. The control person liability claims against all defendants survive.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss in 14-cv-6834 (ECF No. 48) is GRANTED in part and DENIED in part. Defendants' motion to dismiss in 14-cv-8349 (ECF No. 33) is DENIED.

**SO ORDERED.**